Opinion issued August 30, 2018



In The

# Court of Appeals

For The

## First District of Texas

————————————

NO. 01-17-00898-CV

————————————

**DILEEP PUPPALA, M. D., Appellant**

**V.**

**JAMES REID PERRY, Appellee**

---

**On Appeal from the 270th District Court**
**Harris County, Texas**
**Trial Court Case No. 2017-012732**

---

# O P I N I O N

This is an interlocutory appeal from the trial court's order denying Dr. Puppala's motion to dismiss James Perry's health care liability claims for failure to serve adequate expert reports.[1]

---

[1]     *See* TEX. CIV. PRAC. & REM. CODE §§ 51.014(a)(9), 75.351.

In three issues, Puppala contends that the trial court abused its discretion in denying his motion to dismiss Perry's claims because the opinions of Perry's two experts on the element of causation were conclusory and because the two experts were not qualified to offer causation opinions.

We affirm.

## Background

Perry's two expert reports provide the background facts in this case, and we accept the factual statements in the reports for the limited purpose of this appeal. *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 53 (Tex. 2002) (review of Chapter 74 report is limited to four corners of report). Perry's medical records are not before us.

Perry arrived at the emergency room just before 11:00 am on August 22, 2015, complaining of weakness in his left leg, difficulty walking, and poor balance. He was admitted to the hospital and seen by physicians who are not parties to this appeal.

The next day, on Sunday, August 23, Puppala saw Perry for the first time. Puppala noted that Perry's symptoms had worsened; Perry had "weakness in the legs in the lower extremities when he came in" the day before, but now, on August 23, he "has no sensation in both lower extremities, ribs down" and "is not able to move" either lower extremity. Puppala also noted that CT scans were ordered but

2

were "unremarkable." Puppala ordered an MRI to diagnose Perry's neurological condition. Either the same day or the next, the medical staff determined that Perry's size prevented a successful MRI evaluation using the MRI equipment available onsite.

On August 24, Puppala ordered that Perry be transferred to another medical facility to have an MRI. Six medical facilities (identified by name in the expert report) were contacted, but each responded that its MRI equipment could not accommodate Perry's size either. Puppala wrote: "Will continue working on transferring him to a place where he can safely get an MRI of the spine."

The next day, on August 25, Puppala's notes state they "tried every which way to get his MRI done" but could not due to his size and that transfer to another facility "did not materialize."

On the fifth day, August 26, Perry was transferred to another medical facility, and an MRI was successfully performed. Perry was diagnosed with an epidural abscess on his lumbar spine that was placing increasing pressure on his spinal cord. The neurosurgeon who evaluated the MRI suspected that the abscess size and sustained pressure had damaged the spinal cord to the point that the paralysis had become permanent. This was confirmed with surgery. Perry has remained paralyzed from the chest down.

3

Perry sued the various physicians involved in his care during the period of delayed imaging. As to Puppala, Perry submitted expert reports from two physicians: Dr. Alex Lechin, a board-certified pulmonologist, and Dr. Derek Riebau, a board-certified neurologist. Dr. Lechin opined that the standard of care generally requires physicians to timely diagnose and treat patients. More specifically, it requires physicians to initiate an immediate work-up and diagnosis when a patient presents with the inability, or compromised ability, to move their lower extremities so that the chances of recovery are maximized. According to Lechin, the standard of care required Puppala to timely ensure Perry underwent a MRI. Lechin stated that Puppala could have met this standard in multiple ways, including by "communicating the importance of a timely imaging study to outside hospital staff," "articulating the need to transfer the patient to an outside facility and bring the patient back, given that the admitting facility cannot provide the required services," "contacting stand-alone imaging centers," and "personally telephoning hospitals and/or accepting physicians at other facilities." Lechin opined that Puppala breached the standard of care when he failed to ensure a timely MRI.

Lechin's report states that the partial or complete inability to use one's lower extremities is a medical emergency. According to Lechin, when a patient presents with compromised ability to move a lower extremity, the standard of care requires

an "immediate work up" to determine the cause. If an extrinsic etiology is discovered, "the standard of care requires immediate removal, usually surgically." This is because an extrinsic force to the spinal cord applies pressure to the cord and causes damage to the spinal cord. "Recovery and preservation are dependent upon timely diagnosis and treatment of extrinsic forces to the spinal cord that are causing damage."

Thus, Lechin opines that the standard of care required Puppala "to timely ensure Mr. Perry underwent a MRI study" and that Puppala breached this standard "when he failed to ensure Mr. Perry underwent a timely MRI to diagnose" his condition. Riebau agreed.

Regarding causation, Lechin opined that Puppala's breach caused a delay in obtaining the necessary MRI and a delay in diagnosing Perry's abscess. Meanwhile, Perry's condition worsened as the abscess "continued to grow and apply pressure." "As a result of Dr. Puppala's failure to appropriately ensure a timely MRI was performed, Mr. Perry's abscess progressed and caused complete paralysis." Moreover, had an MRI been performed timely, "Mr. Perry would not have suffered permanent paralysis."

Riebau agreed. He noted that Perry presented to the ER on August 22 with weakness in the left lower extremity only. Thereafter, "there was a deterioration in his neurological condition whereby he developed loss of sensation from the chest

5

down . . . ." Riebau opined that "it is more likely than not that the abscess would have been visible on appropriate imaging on 8/22/15," the day Perry presented with left-leg weakness. Riebau opined that it also is "more likely than not that had an epidural lesion been timely diagnosed based upon emergent imaging, . . . Mr. Perry's outcome of paraplegia could have been prevented." Finally, according to Riebau, Puppala's failure to "emergently recognize, evaluate and manage acute spinal cord injury secondary to an extra-axial lesion more likely than not lead to permanent neurological injury. As a result of Dr. Puppala's failure to appropriately ensure appropriate imaging was immediately arranged," Perry's abscess grew and "progressed and caused complete paralysis."

Puppala moved to dismiss Perry's health care liability claims against him, arguing that the two reports were inadequate as to the element of causation and that the two experts were not qualified to opine on causation. The trial court denied Puppala's motion. Puppala appeals.

## Motion to Dismiss

Dr. Puppala contends that the trial court abused its discretion by denying his motion to dismiss Perry's health care liability claims for failure to serve adequate expert reports because (1) the causation opinions of Perry's two experts were conclusory and (2) those two experts were not qualified to opine on causation.

## A.    Standard of review

We review a trial court's ruling on a motion to dismiss a health care liability claim for an abuse of discretion. *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015) (per curiam). We "defer to the trial court's factual determinations if they are supported by evidence," but we review its legal determinations de novo. *Id.* "A trial court abuses its discretion if it rules without reference to guiding rules or principles." *Id.*

## B.    Health care liability expert report requirements

Under the Medical Liability Act, a plaintiff asserting health care liability claims must timely serve each defendant physician and health care provider with one or more expert reports and a curriculum vitae of each expert whose opinion is offered to substantiate the merits of the claims. TEX. CIV. PRAC. & REM. CODE § 74.351(a), (i); *see Mangin v. Wendt*, 480 S.W.3d 701, 705 (Tex. App.—Houston [1st Dist.] 2015, no pet.). The standard for serving an adequate expert report is well established. The expert report must provide a "fair summary" of the expert's opinions regarding the (1) applicable standards of care, (2) manner in which the care rendered by the physician or health care provider failed to meet the standards, and (3) causal relationship between that failure and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6); *Miller v. JSC Lake Highlands Operations, LP.*, 536 S.W.3d 510, 513 (Tex. 2017) (per curiam).

7

For standard of care and breach, the expert report must explain what the physician or health care provider should have done under the circumstances and what the physician or health care provider did instead. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 880 (Tex. 2001). For causation, the expert report must explain how and why the physician's or health care provider's breach proximately caused the plaintiff's injury. *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 459–60 (Tex. 2017).

When the plaintiff timely serves an expert report, and the defendant timely files a motion to dismiss to challenge the adequacy of the report, the trial court may take one of three actions. *Mangin*, 480 S.W.3d at 705. First, if the trial court concludes that the report is adequate, it must deny the motion. *Id.* Second, if the trial court concludes that the report does not constitute an objective good faith effort to comply with the statute, it must grant the motion. *Id.*; *see* TEX. CIV. PRAC. & REM. CODE § 74.351(*l*). Third, if the trial court concludes that the report is an objective good faith effort to comply with the statute but is nevertheless deficient in some way, it may grant the plaintiff one 30-day extension to cure the deficiency and must grant the extension if the deficiency is curable. *Mangin*, 480 S.W.3d at 705–06.

A report qualifies as an objective good faith effort to comply if it discusses each element with sufficient specificity to (1) inform the defendant of the specific

conduct the plaintiff questions and (2) provide a basis for the trial court to conclude that the plaintiff's claims have merit. *Baty v. Futrell*, 543 S.W.3d 689, 693–94 (Tex. 2018); *Mangin*, 480 S.W.3d at 706. In determining whether an expert report constitutes an objective good faith effort to address each element, "a trial court may not draw inferences; instead, it must exclusively rely upon the information contained within the four corners of the report." *Cornejo v. Hilgers*, 446 S.W.3d 113, 123 (Tex. App.—Houston [1st Dist.] 2014, pet. denied); *see Baty*, 543 S.W.3d at 693. And when the issue is the expert's qualifications, the court may also consider the four corners of the expert's curriculum vitae. *Mangin*, 480 S.W.3d at 706.

For causation, an expert report must explain "how and why" the physician's or health care provider's breach proximately caused the plaintiff's injury. *Zamarripa*, 526 S.W.3d at 459–60. Proximate cause has two components: cause-in-fact and foreseeability. *Id.* at 460. A physician's breach was a cause-in-fact of the plaintiff's injury if the breach was a substantial factor in bringing about the harm, and absent the breach (i.e., but for the breach), the harm would not have occurred. *Id.* A physician's breach was a foreseeable cause of the plaintiff's injury if a physician of ordinary intelligence would have anticipated the danger caused by the negligent act or omission. *See Price v. Divita*, 224 S.W.3d 331, 336 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). "No particular words or formality

9

are required, but bare conclusions will not suffice." *Scoresby v. Santillan*, 346 S.W.3d 546, 556 (Tex. 2011). Thus, to provide more than a conclusory statement on causation, an expert report must include an "explanation tying the conclusion to the facts" and showing "how and why the breach caused the injury based on the facts presented." *Jelinek v. Casas*, 328 S.W.3d 526, 539–40 (Tex. 2010).

The purpose of the expert-report requirement is not to determine the merits of the claim but to rule out frivolous lawsuits at the onset of litigation, before the parties have conducted full discovery. *Ross v. St. Luke's Episcopal Hosp.*, 462 S.W.3d 496, 502 (Tex. 2015); *Mangin*, 480 S.W.3d at 706. As we have explained:

> The requirement to serve an expert report arises at the outset of litigation and before the opportunity for the plaintiff to engage in significant discovery, including taking oral depositions of the defendants. As such, the statute itself contemplates that the amount and quality of evidence available at the time of drafting the expert reports will be less than that available at trial on the merits or even the summary-judgment stage.

*Mangin*, 480 S.W.3d at 713 (citations omitted). In reviewing the adequacy of an expert report at this early stage of the litigation, a trial court may not consider an expert's credibility, the data the expert relies on, or the documents he relies on or had failed to consider. *See Mettauer v. Noble*, 326 S.W.3d 685, 691 (Tex. App.—Houston [1st Dist.] 2010, no pet.); *Gonzalez v. Padilla*, 485 S.W.3d 236, 245 (Tex. App.—El Paso 2016, no pet.).

Additionally, an expert report "need not anticipate or rebut all possible defensive theories that may ultimately be presented." *Owens v. Handyside*, 478 S.W.3d 172, 187 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). Nor must the report "rule out every possible cause of the injury, harm, or damages claimed." *Baylor Med. Ctr. at Waxahachie, Baylor Health Care Sys. v. Wallace*, 278 S.W.3d 552, 562 (Tex. App.—Dallas 2009, no pet.).

In determining whether the causation opinions are conclusory, we must remain mindful that expert-report challenges are made at this early, pre-discovery stage in the litigation, not when the merits of the health care liability claim are being presented to the factfinder to determine liability. *Cf. Baty*, 543 S.W.3d at 697 & n.10 (rejecting argument that expert report was inadequate on standard of care, breach, and causation; concluding that expert report sufficed "particularly in light of the purposes the report is intended to serve" at early stage in litigation; and stating that "additional detail is simply not required at this stage of the proceeding").

## C. Trial court did not err in concluding that experts' causation opinions were not conclusory

In his first and second issues, Puppala argues that the trial court abused its discretion in denying his motion to dismiss because Lechin's and Riebau's expert reports were conclusory on the element of causation.

11

Perry's experts opined that Perry had an abscess on his spinal cord that was growing. According to Riebau, the abscess was large enough to be identified through MRI imaging on the day Perry arrived at the ER. On that day, Perry had weakness in his left leg but no paralysis. An MRI was not possible at the location where Perry was being treated, and, according to the experts' opinions, Puppala breached the standard of care by failing to ensure that an MRI was timely performed at another facility. During the four-day delay in obtaining an MRI, the abscess "continued to grow," pressure on his spine was not relieved, there was a "deterioration in [Perry's] neurological condition," and he became paralyzed from the chest down. According to the experts, it is more likely than not that a timely MRI would have revealed the cause of Perry's worsening condition and avoided the permanent paralysis that resulted from the four-day delay of imaging and diagnosis. Their opinion is that Puppala breached the standard of care by not taking certain, identified steps to ensure a timely MRI was performed.[2] And their causation opinion is that Puppala's breach proximately caused the foreseeable injury of permanent paralysis by allowing the natural and foreseeable progression of the abscess's growth and resulting damage through a failure to timely ensure diagnostic imaging.

---

[2]     Puppala does not challenge the expert reports on the elements of standard of care or breach. As such, we consider only whether the causation opinion meets the requirements of Section 74.351.

This causation opinion is in line with other illness- and injury-progression cases in which causation opinions were held to be adequate to meet the requirements of the Medical Liability Act. *See Hayes v. Carroll*, 314 S.W.3d 494, 507–08 (Tex. App.—Austin 2010, no pet.); *Fagadau v. Wenkstern*, 311 S.W.3d 132, 138–39 (Tex. App.—Dallas 2010, no pet.); *see also* TEX. CIV. PRAC. & REM. CODE § 74.351. In these cases, the experts opined that, had the physician not breached the standard of care, a proper diagnosis and medical intervention would have been achieved, and the patient's injuries would have been avoided; thus, the physician's breach in delaying diagnosis or treatment proximately caused the injuries suffered. *See Hayes*, 314 S.W.3d at 507; *Fagadau*, 311 S.W.3d at 138–39. The appellate courts held that the causation opinions were adequate and not conclusory even when they did not specify when along the continuum of illness- or injury-progression the plaintiff's condition became irreversible so that, after that point, any breach and related delay could not be said to have contributed to the ultimate injury. *See Hayes*, 314 S.W.3d at 507 (stating that possibility that factfinder might reject expert's causation opinion and conclude instead that damage "became irreversible at a point prior to the involvement of one or more" of the medical providers did not render expert reports conclusory); *Fagadau*, 311 S.W.3d at 138–39 (rejecting physician's argument that, by failing to specify exact date patient suffered retinal detachment, expert failed to show causal link between

13

failure to refer patient to retinal specialist and permanent injuries suffered when retina detached).

A challenge to an expert's causation opinion was granted by the trial court but later reversed by this court in *Owens v. Handyside*, 478 S.W.3d 172 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). There, the plaintiff went to the ER on three separate occasions complaining of severe headaches, but the doctors did not order any diagnostic tests. *Id.* at 175–76. On her fourth medical visit, diagnostic tests were ordered, and they revealed that she had a "head bleed." *Id.* at 176. The head bleed resulted in permanent blindness, and the patient sued the doctors who failed to order diagnostic tests during her three initial visits. *Id.* The patient's expert opined that, had those physicians ordered diagnostic testing, it was medically probable that her condition would have been diagnosed and treated in a timelier manner, and she most likely would not have been permanently blinded. *Id.* at 179. The physicians argued that the expert failed to explain "how and why" their alleged breach caused the patient's blindness, but we disagreed. *Id.* at 188–90.

We held that the causation opinion was adequate because an "expert may show causation by explaining a chain of events that begins with a defendant doctor's negligence and ends in injury to the plaintiff." *Id.* at 189. The expert explained that this type of injury progression was well known and opined that the physicians' failure to order diagnostic testing caused a delay in diagnosis and

treatment and that the delay resulted in the patient's blindness. *Id.* at 190. The expert further opined that, in reasonable medical probability, early diagnosis would have prevented the blindness. *Id.* We held that the expert report represented a good-faith effort to inform the physicians of the causal relationship between their failure to adhere to the standard of care and the injury, harm, or damages claimed and that the expert's report met the requirements of Section 74.351. *Id.* at 191.

The Austin case, *Hayes*, presents a similar delay-in-diagnosis-and-treatment scenario in which the patient's condition deteriorated rapidly, and the patient's experts opined that the doctors' failure to timely diagnose an emergent medical issue proximately caused the patient's permanent injuries. 314 S.W.3d at 507. There, a woman receiving emergency medical care was given a large amount of IV fluids that caused swelling. *Id.* at 497–98. None of her health care providers realized that a bandage on her leg was becoming increasingly tight as her body swelled. *Id.* at 499. After 28 hours, a nurse noticed the tight bandage and removed it, but the "tourniquet-like effect" of the bandage had already caused necrosis that could not be reversed, requiring the amputation of her leg. *Id.* at 497–98.

The expert opined that, as a consequence of each health care provider's breach, "the extremity's condition went unmonitored, and the impediment to circulation was not removed until after the damage was done. Such actions caused irreversible ischemia of the right lower extremity with resultant amputation." *Id.* at

15

507. The various health care providers sought dismissal on various grounds, the trial court held that the expert's report was adequate, and the health care providers appealed. *See id.* at 499.

The Austin court held that the trial court did not abuse its discretion in concluding that the expert report was adequate because the report notified each provider that, in the expert's opinion, each was responsible for the harm caused by the constrictive bandage in that each failed to notice, loosen, or remove the bandage before permanent injury resulted. *Id.* at 507. At the pre-discovery stage of the litigation, the plaintiff was not required to "marshal all of her evidence or prove her case against a particular defendant. Rather, what the statute requires is that the report constitute a good faith effort to provide a fair summary of the expert's *opinions* regarding causation." *Id.* The expert report met that standard because it informed each defendant of the conduct the plaintiff called into question and provided a basis for the trial court to conclude that the claims have merit. *Id.* at 508. As the Austin court stated, "The expert report is not required to prove the defendant's liability, but rather to provide notice of what conduct forms the basis for the plaintiff's complaints." *Id.* at 507.

The Austin court further explained that, while the factfinder might ultimately reject the expert's causation opinion and determine, as to one or more defendant health care providers, that the damage was already irreversible before that

16

particular defendant provided any medical care, that possibility did not render the expert's causation opinion conclusory. *Id.*; *see Adeyemi v. Guerrero*, 329 S.W.3d 241, 244–46 (Tex. App.—Dallas 2010, no pet.) (in injury-progression case involving delayed diagnosis, court held that expert report was not conclusory because it stated what doctor should have done and what happened because she failed to do it, and it provided "fair summary" of expert's opinions on causal relationship between breach and injury); *Mosely v. Mundine*, 249 S.W.3d 775, 780–81 (Tex. App.—Dallas 2008, no pet.) (holding that expert report constituted good-faith effort to provide fair summary of expert's causation opinion because expert explained opinion that delayed diagnosis allowed disease to progress such that more severe injuries resulted); *see also Bay Oaks SNF, LLC v. Lancaster*, No. 01-17-00982-CV, 2018 WL 3353009, at *12 (Tex. App.—Houston [1st Dist.] July 10, 2018, no pet. h.) (noting that possibility that expert is wrong about how alleged breach caused harm is issue for summary judgment, not motion to dismiss under Chapter 74 as conclusory opinion).

Here, Perry's expert reports explained the experts' causation opinions, including the "how and why" Puppala's alleged breach caused Perry's injury. *See Miller*, 536 S.W.3d at 516–17 (concluding that expert's report adequately explains "how and why" radiologist's breach in failing to detect "foreign body" that was visible on patient's x-ray proximately caused patient's aspiration and subsequent

death). The experts opined that meeting the identified standard of care through identified acts would have detected the physical condition, that early detections are remediable, that "delay in such treatment can cause significant disability," and that "the failure to timely diagnose and treat" the patient proximately caused the injury. Thus, they constituted a good-faith effort to provide a fair summary of the experts' opinions regarding causation and to describe the basis for liability. *See Miller*, 536 S.W.3d at 515–17; *Adeyemi*, 329 S.W.3d at 245–46.

Puppala argues that the expert reports did not contain enough factual assertions, reducing the experts' opinions to assumptions untied to the specific facts of the case. As an example, Puppala asserts that the reports are deficient because they do not contain facts about stand-alone radiology centers' ability to perform MRIs under sedation. First, we note that Section 74.351 expert reports are due before any discovery is conducted in a case. Second, the reports state that an MRI actually was performed at a nearby facility once one was found that could accommodate Perry's size, though in the experts' opinion it was not timely. We fail to see how more detail about MRIs performed under sedation reduce these experts' causation opinions to mere conclusory statements.

Puppala also argues that the experts' opinions are conclusory because they fail to identify when Perry's abscess had grown and damaged his spinal cord to the point that his paralysis was irreversible and they fail to compare the timing of that

18

event to when an MRI could have been obtained had Puppala not breached the applicable standard of care. But the absence of an opinion stating with specificity at what point in the continuum of disease progression an intervention would have proven timely does not cause these experts' causation opinion to be conclusory at this early stage of evaluation. *See Hayes*, 314 S.W.3d at 507 (holding that, while it was possible that factfinder might ultimately reject expert's causation opinion and conclude that plaintiff's injury had already become irreversible before doctor's alleged breach, that possibility did not render expert reports conclusory); *Fagadau*, 311 S.W.3d at 138–39 (rejecting physician's argument that expert's causation opinion was conclusory because it failed to specify exact date patient suffered retinal detachment and therefore failed to show causal link between failure to refer patient to retinal specialist and permanent injuries suffered when retina detached).

We conclude that the experts adequately tied their causation opinion to the facts and explained how and why the alleged breach of the standard of care proximately caused Perry's permanent injuries. *See Jelinek*, 328 S.W.3d at 539–40. In reaching this conclusion, we note that the context in which this these two experts' causation opinions are offered is distinguishable from that in other cases involving multiple medical conditions and competing causal agents. *See, e.g.*, *id.* at 540 (expert's report identified breach of standard of care as failing to ensure that renewal of prescription for hospitalized patient who had on-going infections,

19

identified plaintiff's injury as increased pain and longer hospital stay, and opined that health care provider's breach caused injury; however, report was inadequate because it failed to link conclusion to relevant facts given that patient was receiving medical treatment for multiple other conditions both during and after short-term lapse in antibiotics and expert failed to link causation opinion to facts); *Shenoy v. Jean*, No. 01-10-01116-CV, 2011 WL 6938538, at \*6–10 (Tex. App.— Houston [1st Dist.] Dec. 29, 2011, pet. denied) (expert's report stated that cardiologist breached standard of care by clearing patient for non-urgent surgery in light of patient's concurrent heart-health issues, identified plaintiff's injuries as post-operative respiratory arrest with oxygen deprivation and resulting death, and opined that cardiologist's breach caused patient's injuries; however, report was inadequate because it did not explain "how and why" breach caused plaintiff's injuries in that it did not identify any role pre-existing conditions played in subsequent events, particularly given that patient was "prematurely" extubated, suffered respiratory arrest, was reintubated, later self-extubated, and then suffered second respiratory arrest).

At this expert-report stage, an expert report "does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Miller*, 536 S.W.3d at 517 (quoting *Scoresby*, 346 S.W.3d at 556 n.60). Because Perry's experts' reports provided a fair summary of the experts' opinions

20

regarding the applicable standards of care, a statement identifying the manner in which the care rendered by Puppala failed to meet the standards, and an explanation of the causal relationship between that failure and the injury, harm, or damages claimed, the trial court did not abuse its discretion in denying Puppala's motion to dismissal. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6); *Miller*, 536 S.W.3d at 513; *Mangin*, 480 S.W.3d at 705.

We overrule Puppala's second issue.

## D.    Qualifications

In his third issue, Puppala contends that the trial court abused its discretion by finding that Perry's experts are statutorily qualified to provide causation opinions.

Whether an expert witness is qualified to offer an expert opinion under the relevant statutes and rules lies within the sound discretion of the trial court. *Cornejo*, 446 S.W.3d at 121. The expert's qualifications must appear in the four corners of the expert report or its accompanying curriculum vitae. *Id.* In a health care liability suit, "a person may qualify as an expert witness on the issue of the causal relationship between the alleged departure from accepted standards of care and the injury, harm, or damages claimed only if the person is a physician and is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence." TEX. CIV. PRAC. & REM. CODE § 74.403(a); *see id.*

21

§ 74.351(r)(5)(C) (defining "expert" qualified to give opinion on causation as "a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence"); *Cornejo*, 446 S.W.3d at 120.

Under the Rules of Evidence, an expert witness may be qualified on the basis of "knowledge, skill, experience, training, or education" to testify on scientific, technical, and other specialized subjects, if the testimony would "help the trier of fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702; *see Cornejo*, 446 S.W.3d at 121. "Thus, a plaintiff must show that her expert has knowledge, skill, experience, training, or education regarding the specific issue before the court that would qualify the expert to give an opinion on that particular subject." *Cornejo*, 446 S.W.3d at 121 (internal quotations omitted). Not all licensed physician are qualified to testify on all medical questions; but, at the other extreme, there is no requirement that a physician practice in the particular field for which he is testifying. *Id.* What is required is that the physician demonstrate that he is qualified to opine on the specific issue before the court. *Id.*

Puppala does not challenge the qualifications of Perry's two experts to generally opine that an undetected epidural abscess will grow and apply increasing pressure on a spinal cord and, if undetected and untreated, will cause irreversible paralysis. Nor does he challenge their qualifications to opine that timely diagnosis and treatment, in reasonable medical probability, would allow for successful

22

medical intervention to remove the abscess and pressure and, in doing so, cause the patient to obtain a more favorable result that does not include permanent paralysis. Puppala agrees that Perry's experts "may have experience in suspecting the presence of an epidural abscess and obtaining the diagnostic tests (i.e. MRI) to confirm the diagnosis."

Puppala's causation-qualification challenge is more specific. He argues that Perry's pulmonology and neurology experts are unqualified to opine on two particular aspects of causation: "(1) when would a surgery on [Perry]'s spine have occurred if there was a 'timely' MRI" and "(2) when was [Perry]'s paraplegia irreversible and beyond the point where surgery would likely restore his ability to walk." In other words, Puppala contends that Perry's experts lack the qualifications to identify the moment beyond which a causal link could no longer be established.

But, as we already concluded, at this early stage in the litigation in a case involving the natural progression of an illness or injury, Perry's experts were not required to identify when in the continuum of injury progression Perry's paralysis became irreversible to state a qualifying causation opinion in their pre-discovery expert report. *See Hayes*, 314 S.W.3d at 507; *Fagadau*, 311 S.W.3d at 138–39. Because the expert reports were not required to contain expert opinions on these two specific temporal issues, the expert reports and accompanying CVs are not inadequate for failing to establish a qualification to provide an unnecessary

23

opinion. *See* TEX. CIV. PRAC. & REM. CODE §§ 74.403(a), 75.351(r)(5) (setting forth requirements for expert qualifications).

We overrule Puppala's third issue and, with it, his first issue asserting that the trial court erred in denying his motion to dismiss.

## Conclusion

We affirm.

Harvey Brown
Justice

Panel consists of Chief Justice Radack and Justices Massengale and Brown.