**Opinion issued April 9, 2019**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-18-01020-CV

———————————

**JERRY M. KEEPERS, M.D., Appellant**

**V.**

**CONNIE BLESSETT, Appellee**

---

**On Appeal from the 113th District Court**
**Harris County, Texas**
**Trial Court Case No. 2018-22971**

---

## MEMORANDUM OPINION

Connie Blessett filed a health care liability claim against Dr. Jerry Keepers, alleging that he negligently performed an epidural steroid injection that was meant to minimize Blessett's on-going pain following a car accident five months earlier. Blessett's petition alleged that Keepers injured her spinal cord during the injection

procedure, which caused severe and permanent paralysis on the right side of her body. As required by Chapter 74 of the Civil Practice and Remedies Code, Blessett provided an expert report to support her claim.[1] Keepers moved to dismiss Blessett's claim, challenging the adequacy of the report.[2] The trial court denied his motion, and this interlocutory appeal followed.[3]

In three issues, Keepers contends the trial court abused its discretion in denying his motion because Blessett's expert was not qualified to offer an expert opinion on the standard of care or breach and because the expert's opinions on the elements of the standard of care, breach, and causation were conclusory.

We affirm.

## Background

Blessett provided three expert reports in support of her health care liability claims. All three reports were authored by Dr. Michael Dogali, a neurosurgeon who, according to his curriculum vitae, has held past positions as a professor of neurological surgery at the University of Southern California's medical school, a professor at the University of California, Irvine and chair of its neurological surgery department, a director of New York University Medical Center's

---

[1]      *See* TEX. CIV. PRAC. & REM. CODE § 74.351(a).

[2]      *See id.* § 74.351(b), (*l*).

[3]      *See id.* § 51.014(a)(9).

2

neurosurgery department, and a clinical instructor at Yale University Medical Center.

Dogali's expert reports provide the background facts in this case, and we accept the factual statements in the reports for the limited purpose of this appeal. *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (review of Chapter 74 report is limited to four corners of report). Blessett's medical records are not before us.

Blessett was involved in a car accident in February 2016. When her neck, shoulder, and back pain did not subside after several weeks, Blessett obtained an MRI, which revealed disc herniations in her lower cervical spine. Blessett sought pain management treatment from Keepers.

On June 21, 2016, Keepers performed an epidural steroid injection in Blessett's lower cervical spine, and Blessett later reported a reduction in pain. On July 19, Keepers performed a second epidural steroid injection at the same spinal location (C7–T1). Around noon the next day, Blessett went to St. Luke's Medical Center Emergency Department with complaints of extreme pain and paralysis on her right side. An MRI revealed a lesion in the cervicothoracis spinal cord which St. Luke's noted as a possible "spinal cord injury secondary to needle mispositioning." Blessett continues to have severe and permanent paralysis on the right side of her body more than one year later.

3

Blessett sued Keepers and provided an expert report from Dr. Michael Dogali, who opined that Keepers was negligent in mispositioning the needle during the July 19 epidural steroid injection, causing Blessett's severe and permanent injuries. Keepers moved to dismiss Blessett's claim for failing to provide an adequate expert report. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(b) (providing mechanism for dismissal of health care liability claims for failure to provide adequate expert report). Blessett supplemented her report, Keepers again sought dismissal, and the trial court denied his motion. Keepers appeals.

## Motion to Dismiss

Keepers contends the trial court abused its discretion by denying his motion to dismiss Blessett's health care liability claims because (1) Dogali was not qualified to opine on the standard of care or breach and (2) Dogali's opinions on the standard of care, breach, and causation were conclusory.

### A. Standard of review

We review a trial court's ruling on a motion to dismiss a health care liability claim for an abuse of discretion. *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015) (per curiam). We "defer to the trial court's factual determinations if they are supported by evidence," but we review its legal determinations de novo. *Id.* "A trial court abuses its discretion if it rules without reference to guiding rules or principles." *Id.*

4

**B.    Expert report requirements**

Under the Medical Liability Act, a plaintiff asserting health care liability claims must timely serve each defendant physician and health care provider with one or more expert reports and a curriculum vitae of each expert whose opinion is offered to substantiate the merits of the claims. TEX. CIV. PRAC. & REM. CODE § 74.351(a), (i); *see Mangin v. Wendt*, 480 S.W.3d 701, 705 (Tex. App.—Houston [1st Dist.] 2015, no pet.). The expert report must provide a "fair summary" of the expert's opinions regarding the (1) applicable standards of care, (2) manner in which the care rendered by the physician or health care provider failed to meet the standards, and (3) causal relationship between that failure and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6). "No particular words or formality are required, but bare conclusions will not suffice." *Scoresby v. Santillan*, 346 S.W.3d 546, 556 (Tex. 2011). Instead, the report must explain the basis of the expert's statements and link the expert's conclusions to the facts of the case. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010).

For standard of care and breach, the expert report must explain what the physician or health care provider should have done under the circumstances and what the physician or health care provider did instead. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 880 (Tex. 2001).

For causation, the expert report must explain how and why the physician's or health care provider's breach proximately caused the plaintiff's injury. *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 459–60 (Tex. 2017). Proximate cause has two components: (1) cause-in-fact and (2) foreseeability. *Id.* at 460. A physician's or health care provider's breach was a cause-in-fact of the plaintiff's injury if the breach was a substantial factor in bringing about the harm and, absent the breach (i.e., but for the breach), the harm would not have occurred. *Id.* Even if the harm would not have occurred absent the defendant's breach, "the connection between the defendant and the plaintiff's injuries simply may be too attenuated" for the breach to qualify as a substantial factor. *Allways Auto Grp., Ltd. v. Walters*, 530 S.W.3d 147, 149 (Tex. 2017) (per curiam) (quoting *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 776 (Tex. 1995)). A breach is not a substantial factor if it "does no more than furnish the condition that makes the plaintiff's injury possible." *Id.* (quoting *Union Pump*, 898 S.W.2d at 776). A physician's or health care provider's breach is a foreseeable cause of the plaintiff's injury if a physician or health care provider of ordinary intelligence would have anticipated the danger caused by the negligent act or omission. *See Price v. Divita*, 224 S.W.3d 331, 336 (Tex. App.—Houston [1st Dist.] 2006, pet. denied).

The expert report is not required to prove the plaintiff's case but only to provide notice of the conduct forming the basis of the plaintiff's claim. *Gracy Woods I Nursing Home v. Mahan*, 520 S.W.3d 171, 189 (Tex. App.—Austin 2017, no pet.). The report "need not anticipate or rebut all possible defensive theories that may ultimately be presented" in the case. *Owens v. Handyside*, 478 S.W.3d 172, 187 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). Nor must the report "rule out every possible cause of the injury, harm, or damages claimed." *Baylor Med. Ctr. at Waxahachie v. Wallace*, 278 S.W.3d 552, 562 (Tex. App.—Dallas 2009, no pet.).

In reviewing the adequacy of an expert report, a trial court may not consider the expert's credibility, the data relied upon by the expert, or the documents that the expert failed to consider at this pre-discovery stage of the litigation. *See Mettauer v. Noble*, 326 S.W.3d 685, 691 (Tex. App.—Houston [1st Dist.] 2010, no pet.); *Gonzalez v. Padilla*, 485 S.W.3d 236, 245 (Tex. App.—El Paso 2016, no pet.). Instead, the trial court must limit its review to the "four corners" of the expert report and, when the question of adequacy hinges on the expert's qualifications, the "four corners" of the expert's curriculum vitae. *Mangin*, 480 S.W.3d at 706.

The statute's purpose is to rule out frivolous lawsuits at the onset of litigation, it is not to determine the merits of the claim. *Ross v. St. Luke's Episcopal*

7

*Hosp.*, 462 S.W.3d 496, 502 (Tex. 2015); *Mangin*, 480 S.W.3d at 706. As we have explained:

> The requirement to serve an expert report arises at the outset of litigation and before the opportunity for the plaintiff to engage in significant discovery, including taking oral depositions of the defendants. As such, the statute itself contemplates that the amount and quality of evidence available at the time of drafting the expert reports will be less than that available at trial on the merits or even the summary-judgment stage.

*Mangin*, 480 S.W.3d at 713 (citations omitted).

If the plaintiff "fails to timely serve an expert report, then on the affected health care provider's motion the trial court must dismiss the pertinent health care liability claim with prejudice and award attorney's fees." *Baty v. Futrell*, 543 S.W.3d 689, 692 (Tex. 2018) (citing TEX. CIV. PRAC. & REM. CODE § 74.351(b)). "However, if the motion challenges the adequacy of an otherwise timely report, the court may grant the motion 'only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the [Act's] definition of an expert report.'" *Baty*, 543 S.W.3d at 692–93 (quoting TEX. CIV. PRAC. & REM. CODE § 74.351(*l*)).

A report qualifies as an objective good faith effort if it provides information sufficient to (1) inform the defendant of the specific conduct the plaintiff questions and (2) provide a basis for the trial court to conclude that the plaintiff's claims have merit. *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 513

(Tex. 2017) (per curiam); *Jelinek*, 328 S.W.3d at 539; *see Scoresby*, 346 S.W.3d at 557 (defining report as meeting "minimal standard" of objective-good-faith threshold if it "contains the opinion of an individual with expertise that the claim has merit, and if the defendant's conduct is implicated"). A report that contains conclusory statements that do not put the defendant or the trial court on notice of the conduct complained of fails to meet the threshold of an objective good faith effort. *Palacios*, 46 S.W.3d at 880. The good-faith requirements of the statute have been described as a "lenient standard," "low threshold," and "relatively low bar." *See Scoresby*, 346 S.W.3d at 549; *Loaisiga v. Cerda*, 379 S.W.3d 248, 264 (Tex. 2012) (Hecht, J., concurring in part and dissenting in part); *Baty*, 543 S.W.3d at 698 (Johnson, J., dissenting).

## C.     Trial court did not err in concluding that the expert was qualified

In his first issue, Keepers contends that the trial court abused its discretion in holding that Blessett's expert is statutorily qualified to provide expert opinions on the standard of care and breach.

Whether an expert witness is qualified to offer an expert opinion lies within the sound discretion of the trial court. *Cornejo v. Hilgers*, 446 S.W.3d 113, 121 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). The expert's qualifications must appear in the four corners of the expert report or its accompanying curriculum vitae. *Id.* In a health care liability suit, a physician may qualify as an expert witness

9

on the issue of whether the defendant physician departed from accepted standards of medical care only if the physician: (1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose; (2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care. TEX. CIV. PRAC. & REM. CODE § 74.401(a); *see id.* § 74.351(r)(5)(A). Keepers focuses on the third requirement, arguing that the "primary issue in this appeal is whether or not there is anything within" Dogali's reports "that would indicate Dr. Dogali is actually qualified, via training or experience, to opine on the care provided."

Keepers acknowledges that Dogali is a board-certified neurosurgeon and that his reports state he has performed "countless surgeries and procedures that involved accessing the epidural space" and is familiar with procedures "similar to and more complex than the procedure at issue" here. Nonetheless, Keepers maintains that Dogali's reports are lacking because they do "not explain if all epidural access is the same or even if it routinely uses the same instrumentation, such as a needle." In Keeper's view, the omission requires an inference regarding whether Dogali's "familiarity with any of the noted procedures translates to familiarity with the mechanism of injury" claimed in Blessett's petition: accessing

10

epidural space with a needle. In other words, according to Keepers, Dogali's assertions that he is familiar with similar procedures and has, himself, accessed patients' epidural spaces "countless" times as a neurosurgeon are not specific enough to convey training or experience accessing epidural spaces *with a needle* to demonstrate that Dogali is qualified through his training or experience to provide expert opinions in this case in which Blessett's epidural space was accessed with a needle.

Keepers's argument relies on an overly narrow reading of Dogali's reports, parsing certain words without adequate consideration of the reports as a whole. *See Baty*, 543 S.W.3d at 694 (stating that "courts must view the report in its entirety, rather than isolating specific portions or sections, to determine whether it includes" necessary information). In his reports, Dogali discusses the steps in an epidural injection procedure, the in-procedure indications that a needle has been properly placed, and the potential harms if it has not. For example, he states that "needle placement in the epidural space" must proceed "extremely carefully and [be] continuously observed so as to ensure the needle does not penetrate the dura and/or the spinal cord during injection." Dogali states that he is "personally very familiar" with these topics, including the standard of care and breach of that standard, "having performed several hundred accesses to the epidural space for the injection of drugs" and other procedures. The only logical reading of these statements is that

11

Dogali—a board certified neurosurgeon—has experience, through hundreds of medical procedures, accessing patients' epidural spaces with needles.

Keepers's challenge to Dogali's qualifications is specific: whether his report indicates that he has training or experience accessing epidural spaces with a needle. Dogali's reports demonstrate that he does. The trial court did not abuse its discretion in denying Keepers's dismissal motion to the extent it challenged Dogali's qualifications.

We overrule Keepers's first issue.

## D.      Trial court did not err in concluding that the expert's opinions were not conclusory

In his second and third issues, Keepers contends that Dogali's expert reports are inadequate because they are conclusory on the issues of the standard of care, breach, and causation.

### 1.      The standard of care and breach

As to the standard of care and breach, Keepers argues that Dogali merely noted a bad outcome and then impermissibly asserted that Keepers's failure to avoid the bad outcome was a breach. Keepers's argument tracks that made in *American Transitional Care Centers of Texas, Inc. v. Palacios*, 46 S.W.3d 873 (Tex. 2001).

In *Palacios*, a patient in a rehabilitation facility required restraints while sleeping to avoid falls from his bed. *Id.* at 875. One evening, the nursing staff

observed he was wearing his bed restraints, yet, ten minutes later, the patient fell from his bed and was injured. *Id.* at 876. The plaintiff's expert's report stated that the patient "had a habit of trying to undo his restraints" and opined that "*precautions to prevent his fall were not properly utilized*." *Id.* at 879 (emphasis added). The defendant challenged the expert report, arguing that it failed to identify the precautions that should have been taken.

The Court held that, while one might infer that the expert thought the staff should have tied the bed restraints more securely, health care liability experts cannot rely on inference when stating an opinion on the standard of care and breach. *See id.* at 880. Instead, "the report must inform the defendant of the specific conduct the plaintiff has called into question." *Id.* at 879. The statement that "precautions to prevent [the patient's] fall were not properly utilized" was not a statement of a standard of care because it did not tell the defendant what the expert believed the standard required the defendant to have done differently. *Id.* Maybe the expert thought the defendant should have monitored the patient more closely, restrained him more securely, "or done something else entirely." *Id.* at 880. Because the report did not identify the standard and breach, the Court held the expert report was conclusory and subject to dismissal. *Id.* Merely identifying a bad outcome and a failure to avoid a bad outcome is not an adequate identification of a

standard of care and breach. *See id.*; *see Baty*, 543 S.W.3d at 696 (stating that expert cannot equate medical negligence with bad or unsuccessful result).

Here, Keepers's report is more aligned with the expert report that was held adequate in *Baty*. There, the defendant argued that the plaintiff's claims should be dismissed because the expert report was conclusory, but the Texas Supreme Court held the report was adequate because it informed the defendant of the expert's opinions on what the defendant should have done and what the defendant did instead. *Baty*, 543 S.W.3d at 697. In doing so, the Court recognized that not every medical negligence case involves complex standards of care. At times, the standard of care can be "fairly basic." *Id.* at 694.

In *Baty*, a certified registered nurse anesthetist administered anesthesia in advance of cataract surgery. The procedure involved injecting anesthesia into the space behind the globe of the eye. The plaintiff alleged that the nurse anesthetist negligently inserted the needle into her optic nerve, causing permanent nerve damage and vision loss. *Id.* at 690. For such a procedure, according to the plaintiff's expert, the standard of care was to inject the anesthesia but to not "stick the optic nerve with the anesthesia needle" in the process. *Id.* at 694. The breach or failure to meet that standard, likewise, was simply stated as sticking the nearby optic nerve with the needle.

14

The Court held that the expert report did not require one to infer what the anesthetist should have done differently and, thus, was not conclusory. *Id.* at 695. The standard of care and breach identified by the expert "expressly referenced the 'specific conduct the plaintiff has called into question.'" *Id.* (quoting *Palacios*, 46 S.W.3d at 879). Additional detail was not required in the expert's report. *Id.* at 697. In holding that the expert report met the requirements of Section 74.351, the Court distinguished *Palacios* and the conclusory expert report at issue there:

> [The expert] opines that [the anesthetist] breached the standard by "sticking [the optic nerve] with the retrobulbar needle" "during the administration of the retrobulbar block." If "sticking [the optic nerve] with the retrobulbar needle" is a breach of the standard of care—which, in turn, requires administering the block in the proper manner—then the "proper manner" necessarily encompasses *not* sticking the optic nerve with the retrobulbar needle. Unlike *Palacios*, in which we refused to infer from the report that the hospital's untaken "precautions to prevent [the patient's] fall" included tying the restraints to the bed more securely, here we need not infer anything; the report expressly references the "specific conduct the plaintiff has called into question."

*Id.* at 695.

This case, likewise, involves a "fairly basic" standard of care for an epidural steroid injection. *See id.* at 694. Dogali opined that the standard of care is to inject into the epidural space while ensuring that the needle is properly placed so that it

does not penetrate the dura,[4] the spinal cord, or the intradural space, which could damage the spinal cord. Dogali stated that proper needle positioning can be aided through use of fluoroscope, in which technology allows a visualization of the needle location and site of steroid release. Dogali then opined that Keepers breached the standard of care by failing to ensure that the needle was in the epidural space and by, instead, penetrating the dura, thereby injecting the steroid solution into Blessett's spinal cord and causing injury.

These opinions meet the standard for nonconclusory expert opinions in an adequate expert report, as discussed in *Baty*. Just like the nurse anesthetist was adequately informed of the expert's opinion that she was supposed to inject anesthesia into the open space without sticking the nearby optic nerve and that she breached the standard of care by sticking the optic nerve, Keepers, here, was adequately informed of Dogali's expert opinion that he was supposed to inject the steroid solution into the epidural space without penetrating the dura and that he breached the standard of care by penetrating the dura. "Additional detail is simply not required at this stage of the proceeding." *Id.* at 697.

We overrule Keepers's second issue. We turn now to causation.

---

[4]     Dura is a thin protective membrane that covers the spinal cord. *See Dura mater*, HARVARD MEDICAL SCHOOL MEDICAL DICTIONARY, Harvard Health Publishing, https://www.health.harvard.edu/d-through-i.

## 2. Causation

In his third issue, Keepers contends that Dogali's causation opinion is conclusory and impermissibly relies on proximity in time to infer a causal connection between Keepers's injection of steroid solution at Blessett's C7-T1 spinal location on July 19 and the lesion observed by MRI at the same spinal location on July 20.

Dogali's report states that Blessett reported to the emergency room the day after her epidural steroid injection and that her clinical findings "were consistent with an injury to her spinal cord at the level where Dr. Keepers performed the [epidural steroid injection] procedure the previous day." The radiology report analyzing the emergency room MRI that day stated that Blessett's lesion "could reflect spinal cord injury secondary to needle malpositioning" from the procedure the day before. Dogali's report includes his expert opinion, formed after review of Blessett's medical records, that, to a reasonable degree of medical certainty, the lesion was caused by the needle Keepers inserted incorrectly. Specifically, the "mechanism of injury was the direct penetration of the spinal cord by the Touhy needle inserted by Dr. Keepers and the secondary volumetric and toxic effects of the injection of the steroid containing liquid into the spinal neural tissue, which resulted in neuronal death at the level of injection, and the ante and retrograde

17

degeneration of the spinal cord from the medulla to the thoracic level, as seen on the MRI and confirmed by the patient's neurological deficits."

Dogali also stated in his report that a lesion was visible on the post-injection MRI, the type of lesion observed was consistent with an incident of needle malpositioning, the lesion was at the same spinal cord location as the injection the day before, the lesion and resulting impairment were inconsistent with Keepers's preoperative assessment that Blessett was not demonstrating any deficits before the injection, the lesion was consistent with the deficits Blessett demonstrated the day after the injection, and alternative potential causes of the lesion were considered and rejected because they did "not fit the clinical picture or history documented in the medical records." Dogali opined that to a reasonable degree of medical certainty Keepers malpositioned the needle during the epidural steroid injection procedure, penetrated the dura, and, in doing so, caused Blessett's injuries.

Keepers argues that Dogali relies on "timing alone" to establish the causal link. But Dogali does more. He states that Blessett's medical history does not reveal any other event that might cause these injuries, which are consistent with a needle-malpositioning event. Other possible causes were determined to be inconsistent with Blessett's clinical presentment. And the rapid development of deficits linked to the exact location of the injection, without any other injury event

18

or medical development in the short span of time, is consistent with the injection being the source of the lesion.

Keepers also argues that Dogali failed to provide an "explanation as to how the alleged breach of the standard of care, needle malpositioning, actually caused a spinal lesion." We disagree. Before the procedure, Keepers noted that Blessett had no deficits. Keepers then injected the steroid. The next day—with no indication in her records of any intervening event—Blessett had physical and neurological deficits consistent with a needle malpositioned into the dura. Dogali explained in his report that the needle must not be allowed to penetrate the dura because it will damage the spinal cord. He stated that injecting a needle beyond the epidural space and into the dura is consistent with Blessett's clinical findings the day after the injection, consistent with the lesion noted on the MRI that day, and consistent with Blessett's assessed deficits thereafter. Dogali's expert report provides the "how and why" the alleged breach of the standard of care proximately caused Blessett's permanent injuries, in Dogali's medical opinion: Keepers penetrated the dura with the needle, and injection of the steroid solution into the dura damaged the spinal cord, created the lesion, and left Blessett with permanent damage. *See Jelinek*, 328 S.W.3d at 540 (requiring expert report to convey how and why breached caused injury).

19

At this pre-discovery stage of her suit, Blessett did not have the burden to prove a causal link by a preponderance of the evidence to the satisfaction of a factfinder or to rule out all other possible causes of her injury. *See Puppala v. Perry*, 564 S.W.3d 190, 202 (Tex. App.—Houston [1st Dist.] 2018, no pet.) ("At this expert-report stage, an expert report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial.") (internal quotation omitted). Dogali's expert report provided an explanation of the causal relationship between the needle malpositioning and the injury, harm, and damages claimed. That a competing expert might dispute the causal link or the ultimate factfinder might reject the expert's conclusions is immaterial to whether Blessett met her requirements under Section 74.351. *See id.* Dogali's causation opinion is not conclusory. *See Baty*, 543 S.W.3d at 698 (rejecting defendant's contention that expert's causation opinion was conclusory).

We overrule Keepers's third issue.

## Conclusion

We conclude the trial court did not abuse its discretion in denying Keepers's dismissal motion. We therefore affirm.

Sarah Beth Landau
Justice

Panel consists of Justices Keyes, Higley, and Landau.

20