**Affirmed and Opinion Filed November 29, 2021**



In The
# Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-20-00960-CV

**HARSHA ARAMADA, MD, TOMI OLA-PETERS, MD; UZOESHI ANUKAM, MD; SADO AL BITAR, MD; SAURABH PATEL, MD; AND CHANDAND KODURO, MD, Appellants**
**V.**
**CYNTHIA YATES, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF HUBERT YATES, Appellee**

**On Appeal from the County Court at Law No. 2**
**Dallas County, Texas**
**Trial Court Cause No. CC-19-07083-B**

## MEMORANDUM OPINION
Before Justices Molberg, Nowell, and Goldstein
Opinion by Justice Nowell

This is an interlocutory appeal from an order denying a motion to dismiss a health care liability claim under Chapter 74 of the civil practice and remedies code. The trial court denied the motion to dismiss after appellee filed an amended report. On appeal, appellants argue the trial court abused its discretion because the expert is not qualified and his report does not properly set forth the acts or omissions that breached the applicable standard of care or the causal link between the alleged breaches and appellee's damages. We affirm.

**Background**

Cynthia Yates filed this health care liability claim against doctors Harsha Aramada, MD, Tomi Ola-Peters, MD; Uzoeshi Anukam, MD; Sado Al Bitar, MD; Saurabh Patel, MD, and Chandand Koduro, MD (collectively the "Doctors") after the death of her husband, Hubert Yates. On August 31, 2017, Hubert was admitted to Methodist Mansfield Medical Center for treatment of acute pancreatitis. He had suffered pancreatitis before but reported that this pain felt different. He was diagnosed with acute pancreatitis without inflammation or necrosis. During his twenty-six day stay at Methodist Mansfield, he received CT scans and several x-rays. Neither the CT scans nor an MRI were performed with IV contrast, which would have confirmed whether the pancreatitis was necrotizing or not. The CT scans and chest x-rays included only the lower part of the lungs, but showed lung abnormalities associated with necrotizing pancreatitis, a more serious form of pancreatitis. Hubert's initial complaints improved and on September 26, 2017, he was transferred to a long-term care facility, Kindred Hospital. The same day, he suffered an acute heart attack and passed away at Kindred Hospital.

Yates alleged the Doctors failed to diagnose Hubert with necrotizing pancreatitis and treat him for lung complications resulting from that condition. As a result, he was discharged prematurely and suffered respiratory and cardiac arrest leading to his death. In support of her claim, Yates served the defendants with the expert report of Boris Karaman, MD. *See* TEX. CIV. PRAC. & REM. CODE § 74.351

(requiring plaintiff in health care liability case to serve expert report on defendants). The Doctors objected to Karaman's qualifications and the sufficiency of the report. After a hearing on the objections, the trial court granted Yates thirty days to amend the report and overruled the Doctors' objections. After Yates served an amended report, the Doctors filed a motion to dismiss and objections to the amended report. The trial court overruled the motion following a hearing. The Doctors then filed this appeal. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(9).

## Standard of Review

We review a trial court's order on a motion to dismiss a health care liability claim based on the sufficiency of an expert's report for an abuse of discretion. *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010).

## Applicable Law

Chapter 74 of the Texas Civil Practice and Remedies Code requires claimants in health care liability cases to serve an expert report on each defendant. TEX. CIV. PRAC. & REM. CODE § 74.351. The report must fairly summarize "the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury,

harm, or damages claimed." *Id*. § 74.351(r)(6). The purpose of this requirement "is to weed out frivolous malpractice claims in the early stages of litigation, not to dispose of potentially meritorious claims." *Abshire*, 563 S.W.3d at 223.

"Importantly, the trial court need only find that the report constitutes a 'good faith effort' to comply with the statutory requirements." *Id*. (citing Tex. Civ. Prac. & Rem. Code § 74.351(l)). The Texas Supreme Court has "held that an expert report demonstrates a 'good faith effort' when it '(1) inform[s] the defendant of the specific conduct called into question and (2) provid[es] a basis for the trial court to conclude the claims have merit.'" *Id*. (quoting *Baty v. Futrell*, 543 S.W.3d 689, 693–94 (Tex. 2018)). A report "need not marshal all the claimant's proof," but "a report that merely states the expert's conclusions about the standard of care, breach, and causation" is insufficient. *Id*. The "court's job at this stage of the litigation is not to weigh the report's credibility; that is, the court's disagreement with the expert's opinion does not render the expert report conclusory." *Id*. at 226.

In addition, "the expert report must make a good-faith effort to explain, factually, how proximate cause is going to be proven," although the report need not use the words "proximate cause," "foreseeability," or "cause in fact." *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017). "'[T]he expert must explain the basis of his statements to link his conclusions to the facts.'" *Id.* (quoting *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999)). "[C]ourts

–4–

must view the report in its entirety, rather than isolating specific portions or sections, to determine whether it includes" the required information. *Baty*, 543 S.W.3d at 694.

To establish a causal relationship between the injury and the defendant's negligent act or omission, the expert report must show the defendant's conduct was a substantial factor in bringing about the harm, and, absent this act or omission, the harm would not have occurred. *Mitchell v. Satyu*, No. 05-14-00479-CV, 2015 WL 3765771, at *4 (Tex. App.—Dallas June 17, 2015, no pet.) (mem. op.). Causation is generally established through evidence of a "reasonable medical probability" that the injury was caused by the negligence of the defendant, meaning that it is more likely than not that the ultimate harm or condition resulted from such negligence. *See id.* "An expert may show causation by explaining a chain of events that begins with a defendant doctor's negligence and ends in injury to the plaintiff." *Id.* The report must explain "to a reasonable degree, how and why the breach [of the standard of care] caused the injury based on the facts presented." *Jelinek*, 328 S.W.3d at 539–40; *Quinones v. Pin*, 298 S.W.3d 806, 814 (Tex. App.—Dallas 2009, no pet.) (to satisfy Chapter 74's causation requirement, expert report must include fair summary of expert's opinion regarding causal relationship between breach of standard of care and injury, harm, or damages claimed). "We determine whether a causation opinion is sufficient by considering it in the context of the entire report." *Mitchell*, 2015 WL 3765771, at *4 (internal quotation omitted).

## Analysis

### A. Qualifications

The Doctors argue that Karaman is practicing as a radiologist and is not qualified to opine on the standard of care for internal medicine physicians practicing as hospitalists. They contend that although Karaman is board certified in both internal medicine and radiology, he has not practiced "internal medicine in a clinical setting" for over twenty-seven years.

In a suit involving a health care liability claim, the expert preparing the report must show that he is qualified. TEX. CIV. PRAC. & REM. CODE § 74.351(r)(5)(A). A person may qualify as an expert on the issue of whether a physician departed from accepted standards of medical care only if the person is a physician who:

> (1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;

> (2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

> (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

*Id*. § 74.401(a). In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:

> (1) is board certified or has other substantial training or experience in an area of medical practice relevant to the claim; and

> (2) is actively practicing medicine in rendering medical care services relevant to the claim.

*Id*. § 74.401(c).

The substance of Yates's claim is that, despite signs of the more serious necrotizing pancreatitis and injury to Hubert's lungs, the Doctors failed to order the appropriate testing to diagnose necrotizing pancreatitis and failed to treat the lung complications resulting from that condition. This led to sudden respiratory failure, acute heart attack, and death.

According to his report and curriculum vitae, Karaman has been board certified in internal medicine since 1986 and in radiology since 1990. He is licensed to practice in Ohio and Wyoming and is currently service chief in the department of radiology at the VA Northeast Ohio Healthcare System. He is a graduate of Pennsylvania State University and Thomas Jefferson Medical College of Thomas Jefferson University. He served his residency in internal medicine from 1983 to 1986 and in diagnostic radiology from 1986 to 1990 at Cleveland Clinic Foundation. He completed a fellowship in neuroradiology and neurointerventional training at University Hospitals in Cleveland.

During his radiology residency, he used his internal medicine training and practiced as an intensivist covering medical and cardiac ICUs. He served as a hospital physician, now commonly called a hospitalist. His report indicates he has experience with pancreatitis: "I managed cases of acute non-necrotizing pancreatitis, acute necrotizing pancreatitis and acute or chronic pancreatitis. As severe pancreatitis was common, I had extensive experience with these variations of

pancreatitis. I managed pancreatitis in patients who had received pancreas transplants, something only a minority of internal medical doctors can say."

After his fellowship, Karaman practiced at a level I trauma center from 1991 to 2003, using both his radiology and internal medicine skills. He provided rapid response to patients with medical emergencies in radiology and started an endovascular stroke treatment center, "shaping the internal medicine part of the stroke treatment protocols as well as providing the interventional neuroradiology which made it a success." He also provided body interventional radiology, "treating scores of patients with complications of necrotizing pancreatitis and providing them with Internal Medicine support while undergoing these treatments." Karaman's report states that he has exercised his internal medicine skills throughout his medical career and continues to do so.

Karaman cites specific examples of where he used internal medicine skills to diagnosis rare conditions that "do not show up on imaging in their early phases":

> I also used my internal medicine skills to narrow down the diagnosis when non-specific imaging findings left a host of differential diagnostic possibilities. I consulted with the referring services to help them to the answer. In this way I diagnosed three cases of parathyroid carcinoma, two cases of MTHFR mutation, and hundreds of other less rare conditions. I used a stethoscope daily in my practice.

His report describes teaching experience regarding pancreatitis: "I taught residents and medical students how to tell the difference between acute non–necrotizing pancreatitis and necrotizing pancreatitis and why that was so critical."

During the recent COVID pandemic, he "stood ready at my medical center to take my turn as a hospitalist and intensivist managing COVID-19 positive patients as we prepared for an onslaught of critically ill infected patients." The report concludes:

> During my twenty-nine years of experience as a radiologist trained in diagnostic radiology, in neuroradiology, neurointerventional and body interventional procedures, as well as my internal medicine experience during my entire career, not just in my residency in internal medicine, I have participated in the care of many patients whose cases are similar to that of Mr. Hubert Yates.
>
> . . . .
>
> Having taught the diagnosis and proper management of necrotizing pancreatitis, having provided advice and guidance to those dealing with the acute presentations of the condition, and having managed, imaged and treated the complications which can arise, I am very well qualified to comment on the hospitalists' management of Mr. Yates' case.

Based on Karaman's report and curriculum vitae, the trial court reasonably conclude that he has knowledge of accepted standards of care of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim, and he is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care. *See* TEX. CIV. PRAC. & REM. CODE § 74.401(b)(2), (3). Karaman is qualified to state the standard of care for the appellants because "his report states he has experience and was involved with the type of claim at issue." *Tex. Children's Hosp. v. Knight*, 604 S.W.3d 162, 172–73 (Tex. App.—Houston [14th Dist.] 2020, pet. denied). Even if this were a close call, "[c]lose calls must go to the trial court." *Larson*, 197 S.W.3d at 304. The trial court

did not abuse its discretion by concluding that Karaman is qualified to give the expert report required by section 74.351.

## B. Expert Report Requirements

The Doctors contend the expert report does not set forth the acts or omissions that breached the applicable standard of care or the necessary causal link between the alleged breaches and plaintiff's damages. Specifically, they argue Karaman's opinions about breach of the standard of care are not tethered to the facts and his causation opinions are conclusory. They also argue Karaman improperly treats the individual doctors as a collective unit.

### 1. Standard of Care

In his report, Karaman notes that the "autopsy clearly showed necrotizing pancreatitis." He explains that necrotizing pancreatitis is a very serious condition "with deleterious side effects capable of injuring multiple organ systems. Involvement of more than 30% of the pancreas is often associated with life threatening complications including renal problems, multi-organ system failures, and significantly, lung injury." Adult respiratory distress syndrome (ARDS) is a serious lung injury often associated with necrotizing pancreatitis. "ARDS associated with necrotizing pancreatitis typically shows less consolidation and more ground glass opacity and faint peripheral opacities on CXR and CT scans."

According to the report, Hubert's medical records reflect that he had a history of hypertension, chronic pancreatitis, coronary artery disease and asthma. He went

to Methodist Mansfield complaining of abdominal pain and vomiting. In the emergency room, Hubert received a CT scan of the abdomen and pelvis that showed signs of acute pancreatitis. After a physical examination and diagnostic testing, Hubert was diagnosed with acute pancreatitis without inflammation or necrosis and abdominal pain. He was admitted to the general medical floor of Methodist Mansfield on August 31, 2017 under Aramada's care.

Karaman states that the CT scan could not exclude necrotizing pancreatitis because it was performed without contrast. According to the report:

> Evaluation of pancreatic parenchyma is not possible given lack of intravenous contrast. Contrast enhancement identifies non-necrotic pancreatic tissue and thus confirms that there is necrosis where contrast does not enhance the pancreas. Since no contrast was used, the possibility of necrotizing pancreatitis was not excluded by the scan. . . . Since no IV contrast was used for the CT scan, the doctors who concluded that there was no necrotizing pancreatitis committed a serious blunder. The failure to exclude necrotizing pancreatitis has serious implications on both the quality of care and the outcome of Mr. Yates' severe pancreatitis.

Karaman recognizes that CT contrast could not be used because of the condition of Hubert's kidneys: "Mr. Yates had leukocytosis and elevated transaminases and developed ascites and acute kidney injury (AKI)." But Karaman states a safer alternative was available:

> However, in the absence of CT with contrast, MR imaging may also be used to identify necrosis and assess complications, in cases where CT contrast presents a risk. Neither of these imaging modalities were used appropriately to diagnose the severity of Mr. Yates' pancreatitis and its complications.

The report indicates that Hubert's acute kidney injury and renal failure were also clues for necrotizing pancreatitis. The report states that "[c]ontrast could not be used because of renal failure, another complication of necrotizing pancreatitis, which could have been used as a clue to the underlying process."

Karaman cites to indications of lung abnormalities in the records. Abdominal CT scans performed on September 9 and 19 included a portion of the lungs. The report states:

> The initial study indicated there were early lung changes of patchy ground glass opacities, typical of the pancreatitis associated lung damage of ARDS. The last CT study available also shows lung abnormalities. This was another missed clue that Mr. Yates' pancreatitis was the more serious kind, as lung damage was evident.

Karaman states that chest x-rays on September 15 and 18 still showed lung abnormalities. He continues:

> The only other image of any part of the lung was 9/19/17, the small part of the lung included in the standard abdomen/pelvic CT. This again showed patchy, ground glass changes in the right middle lobe, right lower lobe and left lower lobe. This means that the doctors caring for Mr. Yates had hints that all was not well with the lungs, but failed to properly evaluate the lungs throughout his hospitalization.

Karaman explains that the absence of a full chest x-ray or chest CT scan indicates that the Doctors were not following or evaluating Hubert's lungs. He states:

> The CXRs obtained between 9/11 and 9/15 were not images of Mr. Yates' chest, but rather a 1ow chest/ high abdomen X-ray used to check the position of a nasogastric tube. This shows that the lungs were not being followed using frequent, often daily, chest X-rays ordered to identify lung problems which may occur. This is a very surprising deficit in the care of this patient who had demonstrable abnormalities

–12–

seen in the small area of his lung include[d] on a standard abdominal CT and whose necrotizing pancreatitis was misdiagnosed as non-necrotizing pancreatitis through inept use of the CT findings from a CT which did not include images after IV contrast.

. . . .

Although the patient was seen by a pulmonologist, no formal evaluation of the lungs with a Chest CT scan was performed. No daily serial Chest x-rays were performed. Mr. Yates received no follow up care with a pulmonologist after September 20, 2017 and the Doctor Defendants failed to order another CT Scan with contrast to clearly identify if there was necrosis in the pancreas even up to his discharge. They failed to diagnose his actual condition. They failed to appreciate how other organs were likely compromised, including the lungs.

Karaman describes the standard of care as follows:

In my experience as an internal medicine doctor and radiologist, it takes a patient time to recover from this type of injury. Our practice usually entails a more prolonged observation of a patient's lung function with complications of acute pancreatitis prior to discharge. Based on my experience and training, the standard of care in this case required the doctors to ensure that Hubert Yates was not suffering from necrotizing pancreatitis prior to determining the necessary care plan, and definitely prior to discharge. The standard of care requires that the doctors treating Hubert Yates complete all necessary diagnostic testing to confirm the nature of his diagnosis and ensure his care plan was appropriate.

He also describes the standard of care once necrotizing pancreatitis is diagnosed as follows:

The standard of care for necrotizing pancreatitis is ICU care and careful pro-active observation of his lungs and his respiratory status. There is a constant risk that the patient will tire of the work of breathing while his lungs are affected by the necrotizing pancreatitis. The end result is sudden respiratory failure, collapse and death if these aren't treated. Sudden respiratory collapse in an ICU has better survivability than in a standard hospital ward or other settings. In an ICU the doctors and nurses are equipped to intubate the patient and place that patient on a ventilator while the lungs recover. Without this response to respiratory

–13–

failure, the patient would die.

## 2. Breach of the Standard of Care

The Doctors contend that Karaman's opinions on breach of the standard of care are not tethered to the facts. We disagree. Read as a whole, the report adequately describes the factual basis for Karaman's opinions. In addition to the facts discussed above, Karaman states:

> In this case, the above treating physicians violated the applicable standards of care in failing to diagnose and properly treat Mr. Yates for necrotizing pancreatitis. While each of these doctors individually provided treatment, they all failed to diagnose necrotizing pancreatitis. If any one of these physicians had ordered either an MRI or CT with contrast once Mr. Yates kidney function allowed, they would have been able to diagnose and appropriately treat Mr. Yates.

According to Karaman, the CT scan that was performed could not rule out necrotizing pancreatitis because it was not performed with IV contrast. Karaman identified MRI with contrast as a safer alternative because Hubert's kidney function did not allow a CT scan with contrast. Further, Hubert's renal failure was also a clue that his pancreatitis was the more serious necrotizing pancreatitis. Karaman notes that "patchy ground glass opacities, typical of pancreatitis associated lung damage of ARDS" were shown in early abdominal CT scans and continued to be shown in later x-rays. Despite these indications in the medical records, none of the Doctors ordered a CT scan or MRI with contrast which would have determined whether Hubert had necrotizing pancreatitis. Karaman concludes that "each doctor failed to

diagnosis Mr. Yates with necrotizing pancreatitis based on his acute pancreatitis and signs of organ failure."

Karaman states the Doctors also breached the standard of care by failing to "recognize and treat acute lung injury and ARDS for a patient with acute pancreatitis" and failing to order a "CT scan of the chest for a patient with lung abnormities indicated on the upper most slices of the abdominal CT scans." The report states that abdominal CT scans and x-rays showed at a least a portion of Hubert's lungs and indicated "patchy ground-glass opacities" typical of the pancreatitis associated lung damage of ARDS. Later x-rays continued to show lung abnormalities, but these abnormalities were never followed with a full chest x-ray or CT scan.

We conclude that Karaman's opinions on breach of the standard of care are sufficiently tied to the facts in the medical records to inform the Doctors of the specific conduct called into question and provide a basis for the trial court to conclude the claims have merit. *See Abshire*, 563 S.W.3d at 223.

### 3. Causation

The Doctors argue the report does not state facts to explain what difference a diagnosis of necrotizing pancreatitis would have made in treatment or outcome. We disagree.

According to Karaman, the Doctors could not rule out necrotizing pancreatitis because the CT scan was performed without contrast. The report explains that even

if a CT scan with contrast could not be used because of Hubert's renal function, "an MRI with contrast could have been ordered which would have shown necrotizing pancreatitis while Mr. Yates was still alive and had a reasonable chance of recovery had he been given the proper ICU care."

Karaman opines that based on the patchy ground glass opacities and lung abnormalities shown in the CT scans and x-rays that were performed, "there is unequivocal evidence that Mr. Yates' lungs were affected by the necrotizing pancreatitis, yet no imaging evidence that these lung changes had cleared prior to his discharge." Had Hubert's necrotizing pancreatitis been diagnosed, the standard of care, according to Karaman, required "ICU care and careful pro-active observation of his lungs and his respiratory status." Observation of the lungs and respiratory status is necessary because of the "constant risk" of sudden respiratory failure. Karaman states:

> Sudden respiratory collapse in an ICU has better survivability than in a standard hospital ward or other settings. In an ICU the doctors and nurses are equipped to intubate the patient and place that patient on a ventilator while the lungs recover. Without this response to respiratory failure, the patient would die.

He concludes:

> The autopsy clearly showed necrotizing pancreatitis. Lung damage is common with necrotizing pancreatitis. This lung damage was not adequately assessed, followed or treated. With a high degree of medical certainty, the lung complications engendered by necrotizing pancreatitis were under-appreciated, not sufficiently followed by imaging, and contributed to his demise in what was likely a respiratory arrest suffered when discharged from the hospital.

In addition, the report describes the treatment for ARDS associated with necrotizing pancreatitis:

> CT scans of the chest without contrast and serial chest X-rays are used to follow the lung complications in cases of necrotizing pancreatitis, along with monitoring of the arterial blood gases and including a pulmonologist in the care of the patient with lung complications of pancreatitis. Failure to identify necrotizing pancreatitis exposes the patient to avoidable risk of unsuspected sudden respiratory failure, among other serious complications. Simply being aware of necrotizing pancreatitis allows the hospitalist, pulmonologist or intensivist to check CXR's frequently, order CT scans of the chest correctly. Failing to do this in a patient who has undiagnosed necrotizing pancreatitis falls below the standard of care for patients with this serious condition.

Thus, the report contains sufficient information about the difference a correct diagnosis would have made in treatment and outcome. *See Patterson v. Ortiz*, 412 S.W.3d 833, 839 (Tex. App.—Dallas 2013, no pet.) (holding sufficient report stating "that performing the tests and examinations would have led to the diagnosis of pneumonia and [the patient's] admission to the hospital, where he would have received 'early, aggressive treatment [that], more likely than not, would have saved his life'").

The Doctors complain that the report fails explain at what point Hubert's acute pancreatitis transitioned into necrotizing pancreatitis. "But the absence of an opinion stating with specificity at what point in the continuum of disease progression an intervention would have proven timely does not cause these experts' causation opinion to be conclusory at this early stage of evaluation." *Puppala v. Perry*, 564 S.W.3d 190, 201 (Tex. App.—Houston [1st Dist.] 2018, no pet.); *see Hayes v.*

–17–

*Carroll*, 314 S.W.3d 494, 507 (Tex. App.—Austin 2010, no pet.) (stating that possibility that factfinder might reject expert's causation opinion and conclude instead that damage "became irreversible at a point prior to the involvement of one or more" of the medical providers did not render expert reports conclusory); *Fagadau v. Wenkstern*, 311 S.W.3d 132, 138–39 (Tex. App.—Dallas 2010, no pet.) (rejecting physician's argument that, by failing to specify exact date patient suffered retinal detachment, expert failed to show causal link between failure to refer patient to retinal specialist and permanent injuries suffered when retina detached). Such detail is not required at this early stage in the litigation.

The Doctors also argue that Karaman's opinion that death resulted from cardiac arrest secondary to sudden respiratory arrest, does not explain how he reached this conclusion or why it is preferred to some other cause. But an expert report "need not anticipate or rebut all possible defensive theories that may ultimately be presented." *Owens v. Handyside*, 478 S.W.3d 172, 187 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). Nor must the report "rule out every possible cause of the injury, harm, or damages claimed." *Baylor Med. Ctr. at Waxahachie v. Wallace*, 278 S.W.3d 552, 562 (Tex. App.—Dallas 2009, no pet.); *see also Palacios*, 46 S.W.3d at 879 (explaining "a plaintiff need not present evidence in the report as if it were actually litigating the merits. . . . [T]he information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial").

Next, the Doctors make several arguments attacking the correctness of Karaman's opinions, asserting he failed to cite additional documents or records supporting his conclusions. But it is improper at this early stage of the litigation to consider the "quality of the evidence the experts used as the basis for their factual assumptions." *Quinones*, 298 S.W.3d at 813; *see also Abshire*, 563 S.W.3d at 226 (stating "court's job at this stage of the litigation is not to weigh the report's credibility; that is, the court's disagreement with the expert's opinion does not render the expert report conclusory"). An attack on the data underlying an expert's opinion is beyond the scope of a Chapter 74 motion to dismiss. *Quinones*, 298 S.W.3d at 813.

In determining whether an expert's causation opinion is conclusory, we must remain mindful that expert-report challenges are made at an early, pre-discovery stage in the litigation, not when the merits of the health care liability claim are being presented to the fact finder to determine liability. *Puppala*, 564 S.W.3d at 198. Based on the report as a whole, the trial court could have reasonably determined that the report represented an objective good faith effort to inform the Doctors of the causal relationship between the breaches of the standard of care and the claimed injury, harm, or damages. Therefore, the trial court did not abuse its discretion by denying the motion to dismiss based on the Doctors' causation arguments.

Lastly, the Doctors argue the report is insufficient "in its conflation of the individual Hospitalists as a collective unit." They contend that when a plaintiff sues

multiple physicians, the expert report must set forth the standard of care applicable to each defendant and explain how the defendants' respective breaches of those standards of care are causally linked to the plaintiff's injury. *See Tenet Hosps., Ltd. v. Love*, 347 S.W.3d 743, 753 (Tex. App.—El Paso 2011, no pet.).

However, the same standard of care may be applied to one or more physicians if they owed the same duty to the patient. *See Hollingsworth v. Springs*, 353 S.W.3d 506, 514 (Tex. App.—Dallas 2011, no pet.) ("Thus, to the extent appellants contend appellee's expert reports must fail because they assign the same duties and obligations as to each of a group of defendants, we reject this contention and overrule appellants' objections."); *Sanjar v. Turner*, 252 S.W.3d 460, 466 (Tex. App.—Houston [14th Dist.] 2008, no pet.) ("We therefore conclude that grouping the defendant doctors together under the relevant standard of care for each condition does not render Hoffman's report inadequate."); *Bailey v. Amaya Clinic, Inc.*, 402 S.W.3d 355, 367 (Tex. App.—Houston [14th Dist.] 2008, no pet.) ("However, grouping defendants together in discussing the relevant standards of care does not render an expert report inadequate when all the defendants owed the same duty to the plaintiff.").

The Doctors are all hospitalists who provided care to Hubert during his stay at Methodist Mansfield. Karaman's report specifically names each of them and explains that they all failed to diagnose his actual condition:

Harsha Aramada, MD was the admitting physician. Drs. Harsha

–20–

Aramanda [sic], Tomi Ola-Peters and Uzoeshi, Ankum are hospitalists who worked together as a team to provide care to Mr. Yates. Sado S. Al Bitar MD was the discharging physician. Saurabh Patel, MD and Chandand Koduro, MD also provided medical care to Mr. Yates during his hospital stay. In this case, the above treating physicians violated the applicable standards of care in failing to diagnose and properly treat Mr. Yates for necrotizing pancreatitis. While each of these doctors individually provided treatment, they all failed to diagnose necrotizing pancreatitis. If any one of these physicians had ordered either an MRI or CT with contrast once Mr. Yates kidney function allowed, they would have been able to diagnose and appropriately treat Mr. Yates.

It is not unreasonable to conclude that, as hospitalists, each of the Doctors owed similar duties to plaintiff and, in Karaman's opinion, breached that duty by failing to diagnose and treat his necrotizing pancreatitis and "the lung complications engendered by necrotizing pancreatitis." We reject the Doctors' argument that the report is insufficient because it treats the Doctors as a group.

### Conclusion

We conclude the trial court did not abuse its discretion by overruling the Doctors' objections and motion to dismiss. We overrule appellants issue on appeal and affirm the trial court's order.

*/Erin A. Nowell//*
ERIN A. NOWELL
JUSTICE

200960f.p05

–21–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

HARSHA ARAMADA, MD, TOMI OLA-PETERS, MD; UZOESHI ANUKAM, MD; SADO AL BITAR, MD; SAURABH PATEL, MD, AND CHANDAND KODURO, MD, Appellants

No. 05-20-00960-CV     V.

CYNTHIA YATES, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF HUBERT YATES, Appellee

On Appeal from the County Court at Law No. 2, Dallas County, Texas Trial Court Cause No. CC-19-07083-B.
Opinion delivered by Justice Nowell. Justices Molberg and Goldstein participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee CYNTHIA YATES, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF HUBERT YATES recover their costs of this appeal from appellants HARSHA ARAMADA, MD, TOMI OLA-PETERS, MD; UZOESHI ANUKAM, MD; SADO AL BITAR, MD; SAURABH PATEL, MD, AND CHANDAND KODURO, MD.

Judgment entered this 29th day of November, 2021.