**Opinion issued June 15, 2023**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-22-00230-CV

————————————

**RAMARAO DENDULURI, M.D. AND HOUSTON UROLOGY PARTNERS,
Appellants**

**V.**

**MARIA NANCY BRAVO, INDIVIDUALLY AND AS REPRESENTATIVE
OF THE ESTATE OF JOSE ANTONIO QUINTERO A/K/A HECTOR
RODRIGUEZ, Appellee**

---

**On Appeal from the 151st District Court
Harris County, Texas
Trial Court Case No. 2021-36624**

---

## MEMORANDUM OPINION

Appellee Maria Nancy Bravo, individually and as representative of the estate

of Jose Antonio Quintero, her deceased husband, asserts health care liability claims

against appellants Ramarao Denduluri, M.D. and Houston Urology Partners under

Chapter 74 of the Civil Practices and Remedies Code. Appellee alleges that appellants failed to properly diagnose, treat, or refer Quintero for cancer treatment and that he died because of the treatment delay. Appellants contend the trial court erred by denying their motion to dismiss because appellee's statutorily required expert report was deficient. Because the report was not deficient, we affirm the trial court's ruling.

## Background

In May 2019, Quintero went to West Calcasieu Hospital in Louisiana for scrotal pain. Tests showed a right hydrocele (swelling of the testicle due to fluid accumulation) and abnormalities of the right testicle and right spermatic cord of uncertain cause. Scans also showed that both of Quintero's lungs had pulmonary nodules of unknown origin.

A month later, Quintero saw urologist Ramarao Denduluri. Dr. Denduluri's records note the history of the ultrasound and CT scans and the finding of a right hydrocele. On June 19, Dr. Denduluri operated to remove the hydrocele. On June 24, Quintero developed a hematoma that Dr. Denduluri managed with antibiotics and pain medications. Dr. Dendurluri continued to provide wound care in June, July, and August 2019.

Dr. Denduluri obtained a scrotal ultrasound on September 3, 2019. The ultrasound report described abnormal masses in both of Quintero's testicles. On

September 26, Dr. Denduluri recommended surgical evacuation of the right testicle hematoma with a possible removal of the testicle. The hematoma and testicle removals were done on October 1. The pathology report on the testicle described a mixed germ cell tumor that was 35% embryonal carcinoma with components of yolk sac tumor and choriocarcinoma. Lymphovascular invasion was present, meaning the cancer had invaded the blood vessels and lymphatic system or both. The combination of embryonal cancer and lymphovascular invasion were signs of an aggressive testicular cancer at high risk for metastasis.

By mid-November 2019, Quintero had already had three rounds of chemotherapy. In late November, he had surgery to remove his right spermatic cord and a mass on his pubic bone. Dr. Denduluri noted that a recent CT scan after the chemotherapy treatments had shown reduction in the size of the pulmonary and retroperitoneal lymph nodes. Quintero died in August 2020, allegedly from metastatic testicular cancer.

Appellee sued Dr. Denduluri and his practice, Houston Urology Partners, alleging professional negligence in failing to properly treat, test, and diagnose Quintero, ultimately leading to his death. Because the allegations against appellants are health care liability claims, appellee had to provide a proper expert report. TEX. CIV. PRAC. & REM. CODE §74.351(a). Appellee filed an initial report from urologist Douglas Dow, M.D.

Appellants objected to the sufficiency of Dr. Dow's report, arguing that: (1) his causation opinions were conclusory, based on speculation and assumptions without a factual basis, (2) nothing in his report or curriculum vitae showed his qualification to opine on whether an earlier diagnosis of Quintero's cancer would have probably changed the treatment or outcome of the cancer; and (3) the report provided no basis for the trial court to find appellee's claims meritorious. *See id.*

The trial court granted appellee a 30-day extension under Section 74.351(c) to supplement the report with additional details and support for Dr. Dow's opinions.

After appellee filed Dr. Dow's supplemental report, appellants filed a second motion to dismiss. They argued that the report was still insufficient because Dr. Dow had not provided any factual basis or explanation for his causation opinions, which, in appellants' view, assumed that the testicular cancer that had metastasized to Quintero's lungs in May 2019 was at a lower stage and more easily treatable in June than in October. Appellants also objected to the lack of any information in the supplemental report showing that Dr. Dow was qualified to determine the stage of the cancer in June 2019, or whether a diagnosis then would have resulted in different and more successful treatment. The trial court denied the motion to dismiss.

### Standard of Review

We review a trial court's denial of a Chapter 74 motion to dismiss for an abuse of discretion. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873,

875 (Tex. 2001). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam). A trial court has no discretion to determine the law or apply the law to the facts incorrectly. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992). In determining whether a trial court abused its discretion, we may not substitute our own judgment for the trial court's judgment. *Wright*, 79 S.W.3d at 52.

**Applicable Law**

A trial court must grant a defendant's motion to dismiss a health care liability suit with prejudice unless the plaintiff serves a timely expert report within 120 days of filing the original petition. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(a), (b). The report must represent a good faith effort to comply with the statutory requirements for an expert report. *See id.* § 74.351(*l*).

An expert report is defined as a written report by an expert that provides a fair summary of the expert's opinions about (1) the applicable standard of care; (2) the way the care provided failed to meet that standard; and (3) the causal relationship between that failure and the injury, harm, or damages claimed. *See id.* § 74.351(r)(6); *see also Wright*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 878. An expert report is a low threshold that a person bringing a claim against a health care provider must cross merely to show that her claim is not frivolous. *See Loaisiga v. Cerda*, 379 S.W.3d

5

248, 264 (Tex. 2012) (Hecht, J., concurring). The report need not contain all the plaintiff's proof, but it must include the expert's opinion on each element identified in the statute. *See Palacios*, 46 S.W.3d at 878; *Kelly v. Rendon*, 255 S.W.3d 665, 672 (Tex. App.—Houston [14th Dist.] 2008, no pet.). The plaintiff need not present evidence in the report as if she was litigating the merits at this preliminary stage of the lawsuit. *Palacios*, 46 S.W.3d at 879. Instead, the report must provide only enough information to: (1) inform the defendant of the specific conduct the plaintiff has questioned; and (2) provide a basis for the trial court to conclude that the claims have merit. *Id.*

## Expert Report

Appellants contend the denial of their motion to dismiss was an abuse of discretion because the trial court misapplied the facts in the expert reports and incorrectly found that Dr. Dow was qualified to be an expert and that the reports were sufficient.

### A.    Causation and Sufficiency

Appellants argue that Dr. Dow's reports do not satisfy Section 74.351's requirements because they contain conclusory statements that fail to explain how and why a breach of the standard of care caused the injury. Appellee responds that Dr. Dow's reports are sufficient because they make a good faith effort to comply

with the statute. Because appellants' first and third issues overlap, we address them together.

Causation requires that the expert report explain how and why the alleged breach caused the plaintiff's injury. *Jelinek v. Casas*, 328 S.W.3d 526, 536 (Tex. 2010). An expert report is sufficient if it "provides a fair summary of the expert's opinions . . . regarding applicable standards of care, the manner in which the care rendered . . . failed to meet the standards, and the causal relationship between that failure and the injury." TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6). A trial court only needs to find that the report constitutes a "good faith effort" to comply with the statutory requirements. *Id.* § 74.351(*l*). An expert report shows a "good faith effort" when it "(1) inform[s] the defendant of the specific conduct called into question and (2) provid[es] a basis for the trial court to conclude the claims have merit." *Baty v. Futrell*, 543 S.W.3d 689, 693–94 (Tex. 2018). "[A] report that merely states the expert's conclusions about the standard of care, breach, and causation," without stating the underlying facts on which the inference is based, is insufficient. *See Palacios*, 46 S.W.3d at 879; *see also Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 224 (Tex. 2018) ("the expert must explain the basis of his statements and link conclusions to specific facts."); *Quintero v. Hous. Methodist Hosp.*, No. 01-14-00448-CV, 2015 WL 831955, at *3 (Tex. App.—Houston [1st Dist.] Feb. 26,

205, pet. denied) (mem. op.). We consider both of Dr. Dow's reports to determine whether they represent a good faith effort to comply with these requirements.

In articulating the standard of care and breach, "an expert report must set forth specific information about what the defendant should have done differently"; that is, "what care was expected, but not given." *Abshire*, 563 S.W.3d at 226 (internal quotations omitted). Dr. Dow's reports address the standard of care by remarking that Dr. Denduluri made no notes of Quintero's scrotal ultrasound or CT scan reports and stating that the failure to assess the abnormal findings from these diagnostics breached the standard of care. Dr. Dow highlights that Dr. Denduluri's notes lacked orders, comments, or review of Quintero's continued complaints involving his testicle and the testicular mass. Dr. Dow explains that this delay to properly review and consider the diagnostic testing, combined with the failure to order additional testing, delayed Quintero's cancer diagnosis and treatment.

According to the reports, the standard of care required review of the diagnostic testing, which revealed an abnormally appearing testicle and spermatic chord, and further investigation, including a scrotal physical exam and additional imaging of the scrotal area. *See Abshire*, 563 S.W.3d at 224 (the court's role at this stage is not to determine the report's credibility); *see also Miller v. JSC Lake Highlands Operations*, 536 S.W.3d 510, 515 (Tex. 2017) (per curiam) (at "this preliminary stage, whether those standards appear reasonable is not relevant to the analysis of

whether the expert's opinion constitutes a good-faith effort."). Dr. Dow observes that Dr. Denduluri made few to no notes about Quintero's initial testing in Louisiana. No notes indicate that when Quintero underwent the testicular surgery recommended by Dr. Denduluri, Dr. Denduluri evaluated the abnormal testicle or spermatic chord while he was already removing the right hydrocele located inside the sac surrounding the testicle. Quintero saw Dr. Denduluri five times after the surgery before additional ultrasound imaging was ordered, revealing the testicular mass. Dr. Denduluri did not mention the testicular mass when reviewing the ultrasound report, nor did he order testing of the mass. Thus, the reports identify specific actions that should have been taken but were not. *See Palacios*, 46 S.W.3d at 880.

The reports also discuss how the testing done in May 2019 did not note a change in Quintero's retroperitoneal lymph nodes, which are commonly affected by testicular cancer. In September 2019, Quintero underwent surgery to remove his right testicle. Testing revealed that there was lymphovascular invasion—a sign of a more aggressive cancer. In November 2019, Dr. Denduluri noted that the retroperitoneal lymph nodes had changed in size, reflecting a change in the stage of Quintero's cancer. The reports then connect how early diagnosis of testicular cancer can result in a better chance of survival, and that once the cancer expands over the local lymph nodes, a patient's survival rate decreases significantly.

Considering these aspects of the Dr. Dow's reports, we conclude the reports inform appellants of the specific conduct that appellee has called into question, the standards of care that should have been followed, and what appellants should have done. *See Abshire*, 563 S.W.3d at 225–26 (report adequately links conclusion with underlying facts by asserting that failing to properly assess medical history and physical conditions led to a delay in diagnosis, proper treatment, and to the alleged injury); *Harris Cnty. Hosp. Dist. v. Garrett*, 232 S.W.3d 170, 179 (Tex. App.—Houston [1st Dist.] 2007, no pet.). Although the reports do not identify specific testing that should have been done or notes that should have been made, such detail "is simply not required at this stage of the proceedings." *Baty*, 543 S.W.3d at 697.

For health care liability claims based on the progression of undiagnosed and untreated cancer, an expert report must contain information about (1) the effect of cancer development over time on the patient's prognosis and (2) the potential effectiveness of treatments for the patient's type of cancer. *Kapoor v. Estate of Klovenski*, No. 14-11-00118-CV, 2012 WL 8017139, at *7 (Tex. App.—Houston [14th Dist.] Feb. 16, 2012, no pet.) (mem. op.) (*Kapoor II*); *see also Garrett*, 232 S.W.3d at 179–81. The report must explain how and why the physician's breach of the standard of care proximately caused the plaintiff's injury. *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 459–60 (Tex. 2017).

Causation consists of two components: (1) cause-in-fact and (2) foreseeability. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). A physician's breach was a cause-in-fact of the plaintiff's injury if the breach was a substantial factor in bringing about the harm, and without the breach the harm would not have occurred. *Id.* Even if the harm would not have occurred without the physician's breach, "the connection between the defendant and the plaintiff's injuries simply may be too attenuated" for the breach to qualify as a substantial factor. *Allways Auto Grp., Ltd. v. Walters*, 530 S.W.3d 147, 149 (Tex. 2017) (internal quotations omitted). A breach is not a substantial factor if it "does no more than furnish the condition that makes the plaintiff's injury possible." *Id.* A physician's breach is a foreseeable cause of the plaintiff's injury if a physician of ordinary intelligence would have anticipated the danger caused by the negligent act or omission. *Puppala v. Perry*, 564 S.W.3d 190, 197 (Tex. App.—Houston [1st Dist.] 2018, no pet.).

Dr. Dow opines in his reports that Dr. Denduluri's breach of the standard of care allowed Quintero's cancer to advance. *See Abshire*, 563 S.W.3d at 224–25 (expert report showed causal link between failure to properly assess medical history and physical conditions, delay in diagnosis and proper treatment, and alleged injury); *see also Garrett*, 232 S.W.3d at 181. Dr. Dow notes that Quintero continued to complain to Dr. Denduluri, but Dr. Denduluri did not order further testing or properly investigate the complaints as required by the standard of care. Dr. Dow

11

states that testicular cancer doubles between 10 and 30 days and that lymph node spread is an indicator of Stage III cancer with an "extremely" decreased survival rate. Dr. Dow notes how further investigation into Quintero's condition, at an earlier time, is imperative with the type of testicular cancer Quintero had. He highlights that testicular cancer tends to have a 95 to 96 percent survival rate before spreading to the lymph nodes. And he explains that the failure to timely investigate and diagnosis Quintero's condition led to a failure to refer him to a specialized doctor, such as an oncologist or pulmonologist, which led to a delay in the use of multimodal treatment (therapy combining more than one method of treatment such as, surgery, radiotherapy, and chemotherapy) at an earlier stage. Dr. Dow does not opine that Quintero would have no risk of death from the cancer in the absence of Dr. Denduluri's breaches of the standard of care, only that the failure to meet the standard of care increased that risk because the cancer progressed to Stage III. *Cf. Wright*, 79 S.W.3d at 53 (reasoning that expert report was conclusory when it stated that plaintiff might have had "the possibility of a better outcome" without explaining how defendant's conduct injured plaintiff).

Dr. Dow's reports are like the expert report in *Abshire*. 563 S.W.3d at 221. There, the patient complained of back and chest pain that ultimately resulted in the patient becoming paraplegic. *Id.* at 221–22. The medical staff failed to (1) note that the patient suffered from brittle bone disease, which was relevant medical

information; (2) properly assess the patient based on her medical history, ignoring her medical condition and complaints; and (3) order the proper imaging tests, such as a CT or MRI, to investigate her complaints. *Id.* at 221–23. The report concluded that the standard of care was breached by failing to properly assess medical history and physical conditions leading to a delay in diagnosis and proper treatment that resulted in the patient's alleged injury. *Id.* at 224–25.

*Miller* is also analogous. 536 S.W.3d at 515. In that case, the patient swallowed her dental bridge and died shortly after it was removed. *Id.* at 512. Although x-rays showed the bridge's presence in the patient's trachea when she began showing signs of chest congestion, the reviewing physician failed to notice or identify the problem. *Id.* The expert reports concluded that the physician breached the standard of care by failing to detect the dental bridge in the x-rays and that the delay in removing the bridge caused a series of pulmonary issues resulting in the patient's death. *Id.* at 514. Both *Abshire* and *Miller* held that their respective reports sufficiently addressed how the breach of the standard of care resulted in an injury to the patient. *Abshire*, 563 S.W.3d at 227; *Miller*, 536 S.W.3d at 515.

We must remain mindful that expert-report challenges are made at an early, pre-discovery stage in the litigation, not when the merits of the health care liability claim are being presented to the fact finder to determine liability. *Puppala*, 564 S.W.3d at 198. To provide more than a conclusory statement on causation, an expert

report must include an "explanation tying the conclusion to the facts" and showing "how and why the breach caused the injury based on the facts presented." *Jelinek*, 328 S.W.3d at 539–40; *Abshire*, 563 S.W.3d at 226 ("the court's role is to determine whether the expert has explained how the negligent conduct caused the injury."). The expert report need only provide some basis that the physician's act or omission proximately caused injury. *Owens v. Handyside*, 478 S.W.3d 172, 187–88 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). Dr. Dow's reports assert that if further investigation, testing, and diagnosis had been done earlier, Quintero's cancer treatment would have begun before his cancer advanced to Stage III, involved more specialists, and used multimodal treatment at an earlier time to increase the chance for success. An expert may show causation by explaining a chain of events that begins with the defendant physician's negligence and ends in injury to the plaintiff. *See Whitmire v. Feathers*, No. 01-19-00094-CV, 2020 WL 4983321, at \*16 (Tex. App.—Houston [1st Dist.] Aug. 25, 2020, no pet.) (mem. op.); *Owens*, 478 S.W.3d at 189. Like *Abshire* and *Miller*, Dr. Dow has laid out a timeline of events of when Quintero was under Dr. Denduluri's care and how the breach of the standard of care resulted in Quintero's injury. The reports accordingly inform appellants of the specific conduct that appellee has questioned and provide a basis for the trial court to conclude that the claims have merit. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6); *Palacios*, 46 S.W.3d at 879–880.

14

Because the reports sufficiently identify the applicable standard of care and link Dr. Denduluri's alleged breaches with Quintero's injury, we overrule appellants' claims that the expert reports were conclusory and insufficient.

## B. Dr. Dow's Qualifications

Appellants argue that Dr. Dow is not qualified because his reports do not show any experience or training in treating testicular cancer, determining the stages of testicular cancer, or determining whether an earlier diagnosis would have probably changed the patient's treatment and outcome. Appellee responds that while Dr. Dow is not an oncologist, his experience as a urologist, like Dr. Denduluri, makes him qualified here.

An expert must establish that she is qualified to provide a report addressing accepted standards of care, causation, or both. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(r)(5)(A), (C). Qualifications must appear in the expert report and cannot be inferred. *See Olveda v. Sepulveda*, 141 S.W.3d 679, 683 (Tex. App.—San Antonio 2004, pet. denied); *Hansen v. Starr*, 123 S.W.3d 13, 19 (Tex. App.—Dallas 2003, pet. denied). Accordingly, analysis of an expert's qualifications under Section 74.351 is limited to the four corners of the expert's report and curriculum vitae. *Mem'l Hermann Healthcare Sys. v. Burrell*, 230 S.W.3d 755, 758 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (citing *Palacios*, 46 S.W.3d at 878).

15

To qualify as an expert who can provide opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care in a health care liability case, the expert must be (1) a physician and (2) "otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence." *See* TEX. CIV. PRAC. & REM. CODE §§ 74.351(r)(5)(C), 74.403(a); *Thomas v. Alford*, 230 S.W.3d 853, 857 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

When a physician's failure to diagnose is alleged to have harmed a patient, an expert testifying on causation must be qualified to opine on the effect of a timely diagnosis and treatment on the outcome. *See Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996) (emergency physician was qualified to testify at trial that the standard of care required diagnosis of head injury and referral of patient for neurological treatment, but not as to potential effectiveness of proposed treatments for the undiagnosed neurological condition); *Thomas*, 230 S.W.3d at 859–60 (radiologist was not qualified to offer expert opinion addressing whether delayed cancer diagnosis affected patient's prognosis); *cf. Mosely v. Mundine*, 249 S.W.3d 775, 779–80 (Tex. App.—Dallas 2008, no pet.) (emergency room physician was qualified to opine because proffered expert opinion "related to the ability of an emergency room physician to interpret a routine chest x-ray . . . not the diagnosis and treatment for cancer"). Under the Texas Rules of Evidence, an expert witness

16

may be qualified based on knowledge, skill, experience, training, or education to testify on scientific, technical, or other specialized subjects if the testimony would "assist the trier of fact" in understanding the evidence or determining a fact issue. TEX. R. EVID. 702; *see also Burrell*, 230 S.W.3d at 762. Thus, a plaintiff must show that the expert has "knowledge, skill, experience, training, or education" about the specific issue before the court that would qualify the expert to give an opinion on that subject. *Kuhn v. Sam*, No. 01-20-00260-CV, 2021 WL 3359171, at *16 (Tex. App.—Houston [1st Dist.] Aug. 3, 2021, no pet.) (mem. op.) (citing *Broders*, 924 S.W.2d at 153)).

Not every physician is qualified to testify on every medical question. *See Broders*, 924 S.W.2d at 152–53. But a physician need not practice in the particular medical field about which they are testifying if they can show that they have knowledge, skill, experience, training, or education about the specific issue before the court that would qualify them to give an opinion on that subject. *Cornejo v. Hilgers*, 446 S.W.3d 113, 121 (Tex. App.—Houston [1st Dist.] 2014, pet. denied).

Appellants argue that because this case involves the field of oncology, and nothing in Dr. Dow's reports indicate that he is board certified in oncology or has knowledge or experience in determining the stages of testicular cancer, treating testicular cancer, or determining whether an earlier diagnosis would have changed a patient's treatment and prognosis, he is not qualified to submit an expert report.

17

Appellants note that while Dr. Dow mentions in his supplemental report that during his residency in the 1990s he spent one year treating patients with urologic cancers and has treated 20 patients with testicular cancer, this does not indicate that he has treated patients for cancer.

Appellants compare this case to *Kapoor v. Estate of Klovenski*, where the appellate court found that the expert, a physician specializing in family and emergency medicine, had identified no experience or credentials to qualify her to testify on treatments that would have been available if the patient's cancer was diagnosed earlier; and, whether earlier treatment would have resulted in a more favorable prognosis. No. 14-09-00963-CV, 2010 WL 3721866, at *2–3 (Tex. App.—Houston [14th Dist.] Sep. 23, 2010, no pet.) (mem. op.) (*Kapoor I*).

Appellee argues that *Gunderson v. Wade* is more instructive. *See* No. 14-20-00795-CV, 2022 WL 456720 (Tex. App.—Houston [14th Dist.] Feb. 15, 2022, no pet.) (mem. op.). In *Gunderson*, the plaintiff's expert was an ophthalmologist who opined on the causal link between an alleged failure to perform certain eye examinations and the delayed discovery of the patient's cancer diagnosis of ganglioglioma. *Id.* at *3. The *Gunderson* court held that based on the expert's "education and experience in the field of ophthalmology, the trial court reasonably could have determined that he was qualified to opine on the specific issue before the court. *Id.* at *6.

18

There is not a precise formula for qualifying a doctor as a medical expert, so we begin with a review of Dr. Dow's curriculum vitae. *See, e.g.*, *Benge v. Williams*, 548 S.W.3d 466, 471 (Tex. 2018). Dr. Dow is a urologic surgeon who graduated from the University of Texas Medical Branch and completed his residency at the University of South Florida Moffitt Cancer Center. He is a Diplomate of the American Board of Urology and a Fellow of the American College of Surgery who has been practicing for over 20 years. He is currently a urologist with the Memorial Hermann Medical Group Urology Associates.

Further describing his qualifications in his supplemental expert report, Dr. Dow states:

> Included in my residency was spending one year at The H. Lee Moffitt Cancer Center in Tampa, Florida, the only National Cancer Institute-designated Comprehensive Cancer Center in Florida[.] During my time at Moffitt, I spent the great majority of my time evaluating and treating (both surgically and medically) exclusively urologic oncology patients. I was involved in the care of hundreds of urologic oncology patients while at Moffitt many of whom had testicular cancer. Additionally, I have treated more than 20 patients with testicular cancer in my practice and have performed over 2000 surgeries of the scrotum and its contents. . . .
>
> The standard of care for a Urologist requires that the physician gather an appropriate history, perform a thorough of examination of the patient's genitalia, review the diagnostic studies; the images, reports and the laboratory studies and order further testing as deemed appropriate. . . .
>
> The standard of care for a urologist requires that the physician investigate and diagnose the condition of a patient's genitals. This

19

includes a scrotal physical exam and ordering and reviewing the appropriate diagnostic tests as needed. . . .

As a Urologist [who] completed a six[-]year residency, four of which were Urology specific, and . . . as a Urologist in surgical practice since July 2000, the evaluation of the scrotal mass is extremely common place, almost daily. A scrotal exam and appropriate interpretation of studies related to scrotal complaints is of paramount importance to a practicing urologist.

This supplemental report is more like *Kapoor II* than *Kapoor I*. In *Kapoor I*, the doctor did not identify any experience or credential to show that she was qualified to testify about what treatments would have been available for an earlier cancer diagnosis and whether earlier treatments would have improved the patient's prognosis. 2010 WL 3721866, at *3. The amended report in *Kapoor II* stated that the doctor had cared for and supervised over 500 patients diagnosed with and treated for cancer, diagnosed cancer, and reviewed records kept on the diagnosis and treatment of patients with cancer. 2012 WL 8017139, at *7.

In addition, as in *Gunderson*, where an ophthalmologist submitted an expert report on the care and treatment of a patient by another ophthalmologist, Dr. Dow, a urologist, has submitted expert reports on the care and treatment of a patient by another urologist. While the expert in *Gunderson* did not have experience treating the illness the patient suffered from, he did have experience with the standards of care applicable to the examinations done by an ophthalmologist and had significant experience and education in the field. 2022 WL 456720, at *3. Similarly, Dr. Dow

did not indicate experience in the exact situation Quintero faced, but he did have experience with the standards of care applicable to the examinations done by a urologist based on his significant experience and education in the field.

Based on Dr. Dow's education and experience in the field of urology, the trial court reasonably could have determined that he was qualified to opine on the specific issue before the court—the causal link between appellants' alleged failure to perform certain scrotal examinations and the delayed discovery of Quintero's cancer. The central allegations underlying appellee's suit relate to whether a urologist departed from the standards of care applicable to scrotal examinations and a subsequent scrotal surgery; the record shows that Dr. Dow has significant education and experience in both areas.

Appellants challenge Dr. Dow's lack of training, education, or experience in determining the stages of testicular cancer, treating testicular cancer, or determining whether an earlier diagnosis would have changed a patient's treatment and prognosis. But similar arguments challenging an expert's qualifications related to the specific condition stemming from the alleged negligence have been rejected. *See, e.g.*, *Whitmire v. Feathers*, No. 01-19-00094-CV, 2020 WL 4983321, at \*10–12 (Tex. App.—Houston [1st Dist.] Aug. 25, 2020, no pet.) (mem. op.); *Mosely*, 249 S.W.3d at 779–80.

Therefore, the trial court did not abuse its discretion in concluding that Dr. Dow is qualified to opine on the causal relationship between the alleged negligence and Quintero's subsequent injuries and harm. *See* TEX. R. EVID. 702; *Burrell*, 230 S.W.3d at 762. We overrule appellants' challenge to Dr. Dow's qualifications.

## Conclusion

We affirm the trial court's order.

Sarah Beth Landau
Justice

Panel consists of Justices Landau, Countiss, and Guerra.