**Opinion issued April 24, 2025**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-24-00674-CV**

———————————

**METHODIST HOSPITAL D/B/A HOUSTON METHODIST HOSPITAL, HEMANGSHU PODDER, MD, AND OKECHUKWU OKIDI, MD; LIFEGIFT ORGAN DONATION CENTER; K2 HOLISTIC HEALTH CARE SERVICES, INC AND JANE OGLE, RN (INCORRECTLY NAMED NURSE JANE); TEXAS CHILDREN'S HOSPITAL; BAYLOR COLLEGE OF MEDICINE, Appellants**

**V.**

**TAMMY GARNER, INDIVIDUALLY AND AS THE SURVIVING MOTHER OF DECEDENT J.G., A MINOR, Appellee**

———————————

**On Appeal from the 190th District Court**
**Harris County, Texas**
**Trial Court Case No. 2023-81037**

———————————

**MEMORANDUM OPINION**

In this interlocutory appeal, appellants Methodist Hospital d/b/a Houston Methodist Hospital, Hemangshu Podder, M.D., and Okechukwu Okidi, M.D. challenge the trial court's denial of their motions to dismiss the health care liability claims brought against them by appellee, Tammy Garner, individually, and as the surviving mother of decedent, J.G., in her suit for negligence, wrongful death, and survival. In a single issue, they assert that Garner's expert report—required by statute to survive a motion to dismiss—is so deficient with regard to Houston Methodist Hospital, Dr. Okidi, and Dr. Podder that it was equivalent to no report at all. *See, e.g.*, TEX. CIV. PRAC. & REM. CODE § 74.351(b). As such, appellants argue, the trial court should have dismissed the claims against them rather than granting a 30-day extension to cure the deficiencies in the report. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(b)–(c). If the trial court correctly granted the extension to correct the deficiencies, this Court lacks jurisdiction. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(9). If, instead, the deficient report is essentially no report, and the trial court should have dismissed the claims per § 74.351(b) instead of granting an extension, this Court has jurisdiction over the appeal. *See id.* Because we agree with appellants that the extension was improperly granted with regard to Dr. Okidi, we reverse the trial court's order, render take-nothing judgment in favor of Dr. Okidi, remand to the trial court for entry of an order that

2

both awards Dr. Okidi reasonable attorney's fees and costs of court incurred by him and dismisses Garner's claims against him with prejudice. We conclude that we lack jurisdiction over the appeal filed by Methodist Hospital and Dr. Podder, and we dismiss their appeal from the trial court's order for want of jurisdiction.

## Background

Due to a complication at birth, J.G. required a tracheostomy to live. When he was nine years old, a home health care provider unsuccessfully attempted to change his tracheostomy tube, and J.G. tragically suffered an anoxic brain injury. J.G. was taken by ambulance to Texas Children's Hospital in The Woodlands, where, a few days later, physicians informed his mother that he was "brain dead." After meeting with representatives of LifeGift Organ Donation Center ("LifeGift"), Garner consented to the donation of J.G.'s organs. During the organ procurement surgery, the surgical drape caught fire, burning J.G.'s head, face, ear, shoulder, and chest. Garner later sued Texas Children's Hospital, LifeGift, K2 Holistic Healthcare Services, Inc., Jane Ogle, Methodist Hospital, Dr. Hemangshu Podder, Dr. Okechukwu Okidi, and Baylor College of Medicine, alleging claims for negligence arising from the anoxic brain injury and the organ procurement surgery. Garner alleged that Methodist Hospital was vicariously liable for the actions of Dr. Podder and Dr. Okidi, who were Methodist Hospital employees, and

directly liable for: medical malpractice; negligent handling of a corpse; negligent credentialing, hiring, training, monitoring, supervision, and retention.

Methodist Hospital, Dr. Podder, and Dr. Okidi timely objected to Garner's expert report on the grounds that it failed to implicate each of them, was not a fair summary of the expert's opinion on the applicable standard of care, and neither fairly summarized how the care they each provided fell short of the standard of care nor connected how the alleged failure caused the injury or damages claimed. Methodist Hospital, Dr. Podder, and Dr. Okidi also objected that the expert, Dr. Juliet Emamaullee, was not qualified to address the standard of care and causation in this case. The defendants filed motions to dismiss under Chapter 74 of the Texas Medical Liability Act ("TMLA"). *See* TEX. CIV. PRAC. & REM. CODE § 74.351.

The expert report, entitled "Summary of Organ Procurement Events," has only three paragraphs. The first paragraph of this report talks generally about the "Joint Commission['s]" considerations about surgical fires and how to prevent them.

> According to The Joint Commission, surgical fires represent a sentinel event in the operating room. They have identified several contributing factors, including 1) a lack of communication among surgical team members before and during the procedure, 2) insufficient 'time out' to assess fire risk, and equipment malfunction, among others (Sentinel Event Alert, Issue 68, 10/18/2023). They indicate that surgical fires can be prevented by creating awareness and carefully monitoring elements of the 'fire triangle' which include oxygen, ignition sources (i.e. electricity from a cautery device), and fuel (i.e. paper drapes). Factors contributing to surgical fires includes use of alcohol-based

4

skin preparation materials, failure to allow alcohol-based skin preparations to dry completely, use of oxygen greater than 21% (especially during head and neck procedures), and failure to use proper precautions when using electrosurgical devices like the cautery. The Joint Commission recommends that a Fire Risk Assessment be performed by the operating room team during the 'time out' to address risks that are present. Next, they recommend that the anesthetist maintain local oxygen concentration, 30% where possible, along with stopping or reducing the use of supplemental oxygen to the minimum required for at least one minute before the use of electrocautery devices for head, neck, and upper chest procedures.

The second paragraph summarizes the medical records leading up to and including the organ procurement surgery.

. . . .

When the patient was taken to the operating room, the tracheostomy in place was the 3.5 uncuffed tube per the anesthesia record. (Garner TCH record 000001, page 1662). The records indicate that the procurement surgeon, Dr. Podder, requested that the gauze around the tracheostomy tube be removed prior to skin preparation. The operating room record for the procedure indicates that the skin was cleansed using povidine solution, which is usually not alcohol[-]based (Garner TCH 000001, page 1652). The incision was made at 9:01 am on 12/4/21. According to the anesthesia record, oxygen was being administered via the tracheostomy tube at 2.3 L/min (89% FiO2) at the start of the procedure (Garner TCH 000001, page 1671). Shortly after starting the procedure, the drapes ignited, resulting in an operating room fire. Dr. Williamson, an ENT, was called for an intraoperative consult. . . . [S]he was able to replace the 3.5 uncuffed tracheostomy tube with a 3.5 cuffed pediatric Shiley tracheostomy tube. . . . The operative note for the organ procurement does not document the events surrounding the surgical fire (LifeGift record page 162). In the free text section for the question 'were there any significant thoracic/abdominal cavity intraoperative findings/abnormalities? Yes or No? If yes please describe' Dr. Podder wrote 'sever adhesions, extensive lysis of adhesions done.' There is no mention of the surgical fire or burn injuries to the decedent. When

reviewing the images of the burn injuries that occurred prior to organ procurement, it is evidence that the surgeon began the sternotomy incision at the sternal notch, adjacent to the tracheostomy tube. (LifeGift records, page 251).

The third paragraph notes the absence of evidence of specific preventative measures and the expert's opinions about what, if anything could have been done to reduce the risk of a surgical fire:

> There are several factors in this case that are consistent with established risks for surgical fires as reported by The Joint Commission. This patient had an uncuffed tracheostomy tube, which can lead to air leaking around the tube while on positive pressure ventilation. At the start of the procedure, the patient was being maintained on high levels of oxygen (89%), and the procurement surgeon started the sternotomy within close proximity to this tracheostomy tube. This resulted in a surgical fire where the drapes ignited, leading to partial thickness burns on the chest, neck, shoulder, and face of the decedent. There is no documentation that there was a discussion of preventative measures for surgical fires, including tracheostomy exchange to a cuffed tube, which would reduce the risk of air leak, prior to the organ procurement operation. This was not performed until after the surgical fire, and afterwards, the surgery proceeded without incident. Thus, it is reasonable to believe that this could have been performed prior to the procurement surgery. There is no documentation that a discussion was had during the 'time out' to discuss the uncuffed tracheostomy and high oxygen levels being administered, nor is there documentation that ventilation was held around the time of the incision to reduce the risk of fire per The Joint Commission recommendations outlined above. It is my opinion that these circumstances increased the risk of surgical fire in this case.

The trial court considered the objections, responses, and motions to dismiss, and ruled that "Plaintiff is entitled to a (30) day leave to cure their expert report." This appeal followed.

## Dismissals

Three appellants sought voluntary dismissal of their appeals: LifeGift, Texas Children's Hospital, and Baylor College of Medicine. We **grant** those uncontested motions and dismiss their appeals. *See* TEX. R. APP. P. 42.1(a)(1).

K2 Holistic Health Care Services, Inc. and Jane Ogle, RN (incorrectly named Nurse Jane) failed to timely file an appellate brief. *See* TEX. R. APP. P. 38.6(a) (governing time to file brief). On November 5, 2024, the Clerk of this Court notified K2 Holistic Health Care Services, Inc. and Jane Ogle, RN that the time for filing a brief had expired and the Court would dismiss the appeal unless the parties filed a brief, or a motion to extend time to file a brief, within ten days of the notice. *See* TEX. R. APP. P. 38.8(a) (governing failure of appellant to file brief), 42.3(b) (allowing involuntary dismissal of appeal for want of prosecution), 42.3(c) (allowing involuntary dismissal of case for failure to comply with notice from Clerk of Court). Despite the notice, appellant did not respond. Accordingly, we dismiss the appeal filed by K2 Holistic Health Care Services, Inc. and Jane Ogle, RN for want of prosecution. *See* TEX. R. APP. P. 42.3(b), (c); 43.2(f).

## Analysis

On appeal, Methodist Hospital, Dr. Podder, and Dr. Okidi argue that Dr. Emamaullee's expert report amount to "no report," and, therefore, the trial court erred by granting a 30-day extension of time to cure the deficiencies in the report.

Because Appellee purportedly filed no report "at all," Appellants argue the trial court's only option was to dismiss her claims. Appellants seek reversal of the order and remand for determination of attorney's fees and entry of judgment of dismissal of Garner's claims. We reverse in part.

## I. TMLA Requires an Expert Report.

Under the Texas Medical Liability Act ("TMLA"), a plaintiff asserting a health care liability claim must timely serve each defendant physician and health care provider with at least one expert report, with a CV for the expert whose opinion is offered, to substantiate the merits of the plaintiff's claim. TEX. CIV. PRAC. & REM. CODE § 74.351(a), (i); *see also US Anesthesia Partners v. Robinson*, No. 01-21-00572-CV, 2022 WL 4099835, at *7–8 (Tex. App.—Houston [1st Dist.] Sept. 8, 2022, pet. denied) (mem. op.). The purpose of the expert report requirement is to weed out unmeritorious claims, not to dispose of potentially meritorious claims. *See E.D. by & through B.O. v. Tex. Health Care, P.L.L.C.*, 644 S.W.3d 660, 664 (Tex. 2022); *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018); *Scoresby v. Santillan*, 346 S.W.3d 546, 554 (Tex. 2011).

An expert report must provide a "fair summary" of the expert's opinions on (1) the applicable standard of care, (2) the manner in which the care rendered by the defendant physician or health care provider failed to meet the standard of care, and (3) the causal relationship between that failure and the injury, harm, or

8

damages claimed. TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6); *see also Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013). A "fair summary" of the expert's opinions means that, at the least, the report must state more than the expert's mere conclusions on the standard of care, breach, and causation; it must instead explain the basis of the expert's opinion so as to link the conclusions to the facts of the case. *See Jelinek*, 328 S.W.3d at 539; *Wright*, 79 S.W.3d at 52.

## II.    Early Dismissal Under the TMLA

A defendant may seek dismissal of the plaintiff's claims when no report is served within 120 days after the defendant's original answer is filed or when the elements of the served report are deficient. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(b), (c). When a plaintiff fails to timely serve an expert report, on the defendant's motion, the trial court must dismiss the health care liability claim with prejudice and award attorney's fees. TEX. CIV. PRAC. & REM. CODE § 74.351(b); *Baty v. Futrell*, 543 S.W.3d 689, 692 (Tex. 2018).

When a defendant challenges a plaintiff's expert report as deficient, the TMLA provides the trial court with two options: grant an extension of time to allow the plaintiff to cure the deficiencies in the report or grant the motion to dismiss. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(c) ("If an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient, the court may grant one 30-day extension to the

claimant in order to cure the deficiency."); *id.* § 74.351(*l*) ("A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6).").

It bears repeating that "[t]he purpose of the expert report requirement is to deter frivolous claims, not to dispose of claims regardless of their merits." *Scoresby*, 346 S.W.3d at 554. "The Legislature has determined that failing to timely file an expert report, or filing a report that does not evidence a good-faith effort to comply with the definition of an expert report, means that the claim is either frivolous, or at best has been brought prematurely." *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001). But "when an expert report can be cured in thirty days, the claim is not frivolous." *Scoresby*, 346 S.W.3d at 554. And the Texas Supreme Court has noted that "there are constitutional limitations upon the power of courts . . . to dismiss an action without affording a party the opportunity for a hearing on the merits of his cause, and those limitations constrain the Legislature no less in requiring dismissal." *Id.* at 554 & n. 45 (quoting *TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 918 (Tex. 1991) (citations omitted)). Thus, the Texas Supreme Court has held that "trial courts should be lenient in granting thirty-day extensions and must do so if deficiencies in an expert report can be cured within the thirty-day period." *Id.*; *see*

10

*Ogletree v. Matthews*, 262 S.W.3d 316, 320–21 (Tex. 2007) (holding that trial court has discretion to grant 30-day extension when report is deemed not served because it is deficient). "[A] thirty-day extension to cure deficiencies in an expert report may be granted if the report is served by the statutory deadline, if it contains the opinion of an individual with expertise that the claim has merit, and if the defendant's conduct is implicated." *Scoresby*, 346 S.W.3d at 557 (describing this as "minimal standard"). "All deficiencies, whether in the expert's opinions or qualifications, are subject to being cured before an appeal may be taken from the trial court's refusal to dismiss the case." *Id.*

## III.    Interlocutory Appellate Jurisdiction

"Appellate courts have jurisdiction to consider immediate appeals of interlocutory orders only if a statute explicitly provides such jurisdiction." *Tex. A & M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 840 (Tex. 2007). Interlocutory orders denying a motion to dismiss under section 74.351 are immediately appealable and are reviewed for an abuse of discretion. TEX. CIV. PRAC. & REM. CODE § 51.014(a)(9); *Abshire*, 563 S.W.3d at 226. However, under section 51.014(a)(9), a movant may not appeal an order that grants a 30-day extension. TEX. CIV. PRAC. & REM. CODE § 51.014(a)(9); *see Ogletree*, 262 S.W.3d at 321 ("[T]he statute plainly prohibits interlocutory appeals of orders granting extensions . . . .").

In *Ogletree*, the Supreme Court held that when a trial court denies a motion to dismiss under the TMLA but grants a 30-day extension because a timely served expert report is deficient but curable, the order is not subject to appellate review. 262 S.W.3d at 320–21. In certain situations, however, the served report can be so deficient that it essentially constitutes no report at all. *See Loaisiga v. Cerda*, 379 S.W.3d 248, 260 (Tex. 2012) ("[I]f a report does not meet the standard set in *Scoresby*, it is not an expert report under the statute, and the trial court must dismiss the plaintiff's claims if the defendant has properly moved for dismissal."); *see also Scoresby*, 346 S.W.3d at 557 (holding that, at minimum, expert report must contain opinion of individual with expertise that claim has merit and must implicate defendant's conduct). In such a case, a movant may immediately appeal the denial of his motion to dismiss, "whether or not the trial court grants an extension of time." *Badiga v. Lopez*, 274 S.W.3d 681, 685 (Tex. 2009).

In the present appeal, the trial court granted Garner an extension of time to cure the served expert report, thus implicitly denying Appellants' motion to dismiss challenging the adequacy of the expert report and asserting it was no report at all as to Methodist Hospital, Dr. Okidi, and Dr. Podder. *See Methodist Hosps. of Dallas v. Nieto*, No. 05-18-01073-CV, 2019 WL 6044550, at *7 (Tex. App.—Dallas Nov. 15, 2019, pet. denied) (mem. op.) (trial court's grant of extension to file report was implicit denial of section 74.351 motion to dismiss); *PM Mgmt.-*

*Windcrest NC, LLC v. Sanchez*, 256 S.W.3d 396, 397 (Tex. App.—San Antonio 2008, no pet.) (same).[1]

If we conclude that the timely served report failed to comply with the TMLA "because elements of the report [were] found deficient," then the trial court had discretion to grant a 30-day extension in order cure the deficiency. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(c). In that situation, we would dismiss this appeal for want of jurisdiction because section 51.014(a)(9) expressly prohibits an interlocutory appeal from an order granting an extension of time to cure a deficient expert report. On the other hand, if we find that the report failed to meet the minimal *Scoresby* standard, then we would conclude that the report was so deficient that it was no report at all mandating dismissal of Garner's claims. In that situation, we would hold that we have interlocutory jurisdiction under section 51.014(a)(9), and we would reverse the trial court's order, and remand with instructions to dismiss the claims and determine an appropriate award of costs and attorney's fees. *See Badiga*, 274 S.W.3d at 684 ("The exception to section 51.014(a)(9) prohibiting appeal from an order granting an extension under section 74.351 does not apply when no expert report has been served.").

---

[1] *But see Meridian Ltc, Ltd. v. Byers*, No. 07-13-00343-CV, 2015 WL 525001, at \*2 n.4 (Tex. App.—Amarillo Feb. 9, 2015, no pet.) (mem. op.) (declining to find that extension of time to file expert report was implicit denial of motion to dismiss).

## IV.  No Report Implicated Dr. Okidi

Dr. Okidi asserts that the report, which does not mention him, does not satisfy the minimal *Scoresby* standard, meaning it is no report at all as to him. We agree. The report does not identify Dr. Okidi at all. Garner argues that it need not identify Dr. Okidi by name. She asserts that a report does not fail to implicate a defendant's conduct solely because the defendant is not identified by name. *See Ogletree*, 262 S.W.3d at 317, 321–22 (expert report "implicated" a defendant's conduct because it was directed solely to the defendant physician's care "although it did not mention him by name"); *Troeger v. Myklebust*, 274 S.W.3d 104, 105, 110 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (health care liability claim against one provider). But in each of those cases, there was only one defendant, so even if the defendant was not named individually, the statements in the expert report could still easily identify the defendant. *See Ogletree*, 262 S.W.3d at 322; *Troeger*, 274 S.W.3d at 110.

Garner sued Dr. Okidi along with multiple other defendants who were also health care providers. The expert report did not identify Dr. Okidi as part of a surgical team or in any other manner, although it identified Dr. Podder, Dr. Ahuja (an anesthesiologist), and Dr. Williamson (an ENT surgeon "called for an intraoperative consult" after the fire). The trial court was not permitted to consider any other document outside the four corners of the expert report to supply missing

14

information or determine whether Dr. Okidi was present during the operation or to infer what role he played in the organ procurement operation. *Puppala v. Perry*, 564 S.W.3d 190, 197 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (explaining that court reviewing adequacy of expert report "may not draw inferences, instead it must exclusively rely upon the information contained within the four corners of the report"). The report did not implicate Dr. Okidi. Therefore, it did not meet the minimal *Scoresby* standard. *See Scoresby*, 346 S.W.3d at 557.

Because the report did not meet *Scoresby's* minimal standard, it was no report at all as to Dr. Okidi, and the trial court should have granted his motion to dismiss. *See Loaisiga*, 379 S.W.3d at 260 (holding that expert report can sometimes be so deficient as to be considered no report at all); *see also Scoresby*, 346 S.W.3d at 557 (at minimum, expert report must contain opinion of individual with expertise that claim has merit and implicate defendant's conduct).

We further conclude that we have jurisdiction over the appeal of the trial court's denial of the motion to dismiss the claims against Dr. Okidi. *See Badiga*, 274 S.W.3d at 685. Because the trial court abused its discretion by denying Dr. Okidi's motion to dismiss, we reverse the trial court's order as to Dr. Okidi.

## V. The Deficient Report Implicated Dr. Podder.

Dr. Podder acknowledges that the expert report names him, but he argues that the report does not implicate him because it does not state that he breached a

15

standard of care or that such breach caused harm. Garner maintains that the report implicates Dr. Podder, arguing that Dr. Emamaullee opined that he: (1) failed to assess the risk of fire properly; (2) failed to cuff the unstable, uncuffed tracheostomy tube; (3) failed to conduct a "time out" to discuss the uncuffed tracheostomy tube and oxygen being administered when he began the sternotomy in close proximity to the tube; and (4) failed to properly report the surgical fire and burns. In her brief, Garner also argues the Dr. Podder "began the sternotomy within close proximity to the tracheostomy tube with the electrosurgical device, which ignited the drapes, resulting in the surgical fire," but it is unclear if she asserts that this was included in Dr. Emamaullee's report. Appellee's Br. 9.

Dr. Emamaullee's expert report identified Dr. Podder as the "procurement surgeon," and it stated that he "requested that the gauze around the tracheostomy tube be removed prior to skin preparation." The report also stated that Dr. Podder included notes about adhesions in a free text section of the operative note for the procurement, but he did not mention the surgical fire or J.G.'s burn injuries. The report states that a fire ignited "shortly after starting the procedure," and that "the procurement surgeon started the sternotomy within close promixity" to J.G.'s tracheostomy tube that was maintained at about 89% oxygen at the beginning of the procedure. The report does not identify what tool was used to make the initial incision.

16

The expert report explains what factors can contribute to the risk of a surgical fire, which of those factors were present, and what preventative measures can be taken to minimize the risk of a surgical fire. The report states that no documentation indicates that "there was discussion of preventative measures for surgical fires," including measures that would have reduced the risk of an air leak during the procurement operation.

The report fails to identify what the Joint Commission is, whether its statements and recommendations are standards of care, and how Dr. Emamuallee's knowledge, skill, and experience allow her to opine that these are, in fact, standards of care. The report is deficient, therefore, as to standard of care and breach of the standard of care. The report also does not explain how the failure to communicate before or during the procurement surgery caused Garner's injuries. And the report is deficient for failing to identify any conduct specific only to Dr. Podder, if any, that breached the standard of care and caused the fire.[2]

The expert report also fails to explain what qualifies Dr. Emamaullee to opine about the standard of care applicable to a procurement surgeon or any health care provider in regard to prevention of a surgical fire. For example, while the report states that the "Joint Commission" has identified several factors that

_____

[2] For example, the report arguably implies that Dr. Podder used electrocautery to make the incision, providing a spark to ignite the fire. But it does not actually state that he made the incision or what type of instrument he used.

contribute to operating room fires, the report does not explain who or what the Joint Commission is, or how Dr. Emamuallee knows that the contributing factors or recommendations from the Joint Commission are standards of care applicable to Dr. Podder in this situation.

Despite the expert report's failure to connect Dr. Emamaullee's knowledge, skills, and experience to the relevant standard of care in this case, her curriculum vitae indicates that she is a person with expertise in the areas of surgery, organ transplantation, research, and education. And despite the identified deficiencies in the report, we conclude the report meets *Scoresby's* minimal standard because it includes an opinion of an individual with expertise that Garner's claim has merit, and it implicates Dr. Podder as one of the health care providers who was present for the organ procurement surgery and allegedly failed to prevent the operative fire by failing to adequately communicate with his colleagues about known and obvious fire hazards. *See Scoresby*, 346 S.W.3d at 557; *see also Potts*, 392 S.W.3d at 630 ("A report need not cover every alleged liability theory to make the defendant aware of the conduct that is at issue."). While Garner's expert report is deficient because it fails to include sufficient specificity, a poorly written expert report is not necessarily an indication of a frivolous claim. *See Scoresby*, 346 S.W.3d at 557 ("[W]hen an expert report can be cured in thirty days, the claim is

18

not frivolous."). Nor is the report an indication, in this case, that no report was filed at all as to Dr. Podder.

We conclude that the trial court had discretion to grant an extension of time to allow Garner to cure the report's deficiencies as to Dr. Podder, and the exercise of that discretion is not immediately reviewable by interlocutory appeal. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(9). Therefore, we conclude that we lack jurisdiction over Dr. Podder's appeal.

## VI. The Deficient Report Vicariously Implicated Methodist Hospital.

It is undisputed that the organ procurement surgery during which J.G. was burned occurred at Texas Children's Hospital and that Dr. Podder and Dr. Okidi were employed by Methodist Hospital. Garner alleges that Methodist Hospital is vicariously liable for the allegedly negligent conduct of both doctors. When a health care liability claim against a defendant health care provider is based on vicarious liability, an expert report that meets the statutory standards as to the defendant health care provider's employee is sufficient to implicate the health care provider's conduct. *See Potts*, 392 S.W.3d at 632; *see also Gardner v. U.S. Imaging, Inc.*, 274 S.W.3d 669, 671–72 (Tex. 2008) ("When a party's alleged health care liability is purely vicarious, a report that adequately implicates the actions of that party's agents or employees is sufficient."). Similarly, when an expert report is insufficient as to an employee, it is also insufficient as to the

19

employer health care provider for the purpose of vicarious liability. *See US Anesthesia Partners*, 2022 WL 4099835, at \*10 (collecting cases).

Methodist Hospital's liability was based on a theory of vicarious liability for the acts of Dr. Okidi and Dr. Podder. Because we have concluded that the expert report satisfies the minimal *Scoresby* standard as to Dr. Podder, we hold that it likewise satisfies the minimal *Scoresby* standard as to Methodist Hospital. *See US Anesthesia Partners*, 2022 WL 4099835, at \*10. We lack jurisdiction to consider this challenge.

## Conclusion

We dismiss the appeals of LifeGift, Texas Children's Hospital, and Baylor College of Medicine, K2 Holistic Health Care Services, Inc. and Jane Ogle, RN.

We reverse the order of the trial court denying Dr. Okidi's motion to dismiss, and we remand to the trial court for entry of an order that awards Dr. Okidi reasonable attorney's fees and costs of court incurred by him and dismisses Garner's claims against him with prejudice.

We dismiss the appeal of Dr. Podder and Methodist Hospital for want of jurisdiction.

Susanna Dokupil
Justice

Panel consists of Justices Rivas-Molloy, Johnson, and Dokupil.

20